UNITED STATES of America, Appellee,

v.

David MASTROIANNI,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Dennis SAGAN, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph P. BARKETT, Defendant,
Appellant. (Two Cases.)

UNITED STATES of America, Appellee,

v.

Joseph C. PIOGGIA,
Defendant, Appellant.

In re GRAND JURY. (Two cases).

Appeal of Joseph P. BARKETT.

Appeal of Joseph C. PIOGGIA.

UNITED STATES of America, Appellee,

v.

Joseph P. BARKETT,
Defendant, Appellant.

Nos. 83–1910, 83–1913, 83–1925, 83–1966,
84–1027 to 84–1029.

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1984.

Decided Oct. 30, 1984.

Nancy Gertner, Boston, Mass., with whom Judith Mizner, and Silverglate, Gertner, Baker & Fine, Boston, Mass., were on brief, for Joseph P. Barkett and Joseph C. Pioggia, appellants.

Andrew Good, Boston, Mass., with whom John J. Barter, Boston, Mass., was on brief, for David Mastroianni, appellant.

Alfred Paul Farese, Everett, Mass., with whom Michael F. Natola, Everett, Mass., was on brief, for Dennis Sagan, appellant.

Harry C. Mezer, Boston, Mass., with whom Alan Dershowitz, Cambridge, Mass., Mass. Ass'n of Criminal Defense Lawyers, Ephraim Margolin, Denver, Colo., Nat. Ass'n for Criminal Defense Lawyers, John Reinstein, Boston, Mass., Civil Liberties Union of Massachusetts, were on brief, for Joseph P. Barkett, Joseph C. Pioggia and David Mastroianni, appellants, amicus curiae.

Robert S. Mueller, III, Asst. U.S. Atty., San Francisco, Cal., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Circuit Judge, ALDRICH and SKELTON,* Senior Circuit Judges.

COFFIN, Circuit Judge.

This is a consolidated appeal by four defendants from their convictions for conspiracy to distribute cocaine. Defendants raise six issues on appeal, each concerning a ruling made on a pretrial motion. For the reasons set forth below, we affirm the district court's rulings.

## A. BACKGROUND

### 1. *Factual*

The basic facts concerning defendants' drug distribution activity and their prosecution are as follows.[1] Defendants were convicted of a conspiracy which involved a cocaine distribution network in two distinct regions of Massachusetts, Martha's Vineyard and the Northhampton/Springfield area. The network operated from late 1979 to early 1982 and was headed by defendants Joseph C. Pioggia and Joseph P. Barkett. While Pioggia remained behind the scenes, Barkett took care of the purchasing, transporting, cutting, and initial distribution of the cocaine. Assisting Barkett with the transportation of the cocaine from Florida, where it was purchased, was co-conspirator Anthony Cellilli. Cellilli was also responsible for helping Pioggia with the purchase of real estate on Martha's Vineyard, where the operation moved in the spring of 1980, after starting in Northhampton. In this new location the network purchased and distributed approximately a kilo of cocaine each month. Defendants David Mastroianni and Dennis Sagan were among those who distributed the cocaine on Martha's Vineyard. Mastroianni distributed small amounts of cocaine and collected funds from Pioggia's and Barkett's customers. Sagan received multi-

---

* Of the Federal Circuit, sitting by designation.

1. Facts that are specific to a single issue are developed later, in the discussion of that issue.

ounce quantities, cut and repackaged the cocaine, and distributed it for resale.

The federal government appears to have learned of the network in the spring of 1981. In the fall of 1981, the United States Attorney's office obtained pen registers for various telephones, and Massachusetts investigators also became involved at about that time. In August of 1981, Cellilli was arrested in Florida on cocaine and firearms charges. In late fall, Special Agent Edward K. O'Brien of the Federal Drug Enforcement Administration (DEA) had two conversations with Cellilli about the possibility of his cooperation with authorities. On January 8, 1982, Cellilli called O'Brien and formally began cooperating with the federal government the next day when he met with O'Brien in Enfield, Connecticut, and gave information concerning his prior involvement with Pioggia, Barkett, and their cocaine distribution network.

Five days later, the district attorney for the Cape and Islands District of Massachusetts obtained a warrant authorizing the interception of wire communications over a telephone at Pioggia's residence on Martha's Vineyard. The application for the warrant was based primarily upon the affidavit of Massachusetts State Trooper William McGreal. In his affidavit, he stated that a wiretap was necessary because there had been no success in penetrating the network by other means and that penetration in the future was unlikely unless the wiretap was authorized.

During the month that followed, Cellilli met a number of times with federal agents and divulged considerable information concerning the drug conspiracy. On February 8, 1982, Massachusetts state police searched property belonging to all four defendants, but only Barkett was charged with possessing cocaine. On February 24, 1982, Cellilli attended a meeting at the offices of Barkett's attorney, which was also attended by defense counsel for both Pioggia and Barkett, as well as by the four defendants. Cellilli was authorized by federal agents to attend the meeting because his attendance was seen as necessary to insure his safety and because it was thought that further criminal activities might be discussed. After the meeting he was partially debriefed by the government. In the months that followed, Cellilli met a number of other times with Pioggia and Barkett, but never again while in the presence of their defense counsel.

### 2. *Procedural*

Following state indictments, a federal indictment of some of the defendants, and a superseding indictment, on November 19, 1982, a second superseding indictment was returned against all defendants. Each defendant was charged with conspiracy to possess with intent to distribute cocaine, and Pioggia and Barkett were charged with a number of substantive counts in violation of 21 U.S.C. § 841 and with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848.

Numerous pre-trial motions were made. Extensive hearing was had only on the motion charging the government with purposely causing informant Cellilli to attend the February 24 meeting of defendants and their counsel and thereby obtaining confidential information to their substantial detriment. These and all other motions to dismiss and suppress were denied during the summer of 1983.

After a two-month trial, defendants were convicted and sentenced on all charges but that of engaging in a continuing criminal enterprise. Following their sentencing and release on bail pending appeal, Pioggia and Barkett were served with subpoenas to testify before a federal grand jury on December 21, 1983. In anticipation of their assertion of their Fifth Amendment privilege, both were granted immunity pursuant to 18 U.S.C. §§ 6002 and 6003. Both refused to testify, however, asserting that questions to be put to them were the product of electronic surveillance that was illegal because it had been authorized on the basis of Trooper McGreal's allegedly false statement. On January 6, 1984, both Pioggia and Barkett were held in contempt by the district court and committed to the custody

of the attorney general. Their incarceration was to end either when they expressed a willingness to testify or the term of the grand jury expired, but in no case was the period to exceed eighteen months.

On appeal, defendants challenge a number of aspects of the denials of their pretrial motions, as well as the justification given for holding Pioggia and Barkett in contempt. The issues that defendants raise are as follows: (1) whether Pioggia's and Barkett's Fifth and Sixth Amendment attorney-client privilege and right to effective counsel were violated by the government's authorizing Cellilli to attend the February 24, 1982, meeting and by his subsequent debriefing; (2) whether the district court abused its discretion in denying an evidentiary hearing on whether evidence obtained through the wiretap should have been suppressed because of the alleged misrepresentation in State Trooper McGreal's affidavit; (3) whether the district court abused its discretion in denying an evidentiary hearing on whether the government prejudicially delayed bringing the indictments in violation of appellants' due process rights; (4) whether the district court abused its discretion in denying Barkett an evidentiary hearing on whether the government deliberately used Cellilli to elicit incriminating statements from Barkett while he was under indictment; (5) whether the district court abused its discretion in denying Sagan's motion to substitute counsel; (6) whether the district court abused its discretion in denying Sagan's motion to sever. Each of these issues requires separate consideration.

## B. DISCUSSION

### 1. *Propriety of Authorizing Informant to Attend Meeting and Thereafter Debriefing Him*

Pioggia and Barkett argue that their Fifth and Sixth Amendment right to counsel and attorney-client privilege were violated when the state, without proper justification, authorized Cellilli, a government informant, to attend a joint defense meeting at the offices of Barkett's attorney. They claim additionally that the subsequent debriefing of Cellilli and the resulting disclosure to the government of confidential attorney-client communications resulted in a breach of appellants' constitutional rights.

The facts relevant to this claim are as follows. On February 20, Pioggia asked Cellilli to attend a meeting with defense counsel on February 24 to discuss mortgage loans arranged by Cellilli, to document legitimate sources of funds for the property on Martha's Vineyard and for Pioggia's construction activities, and to discuss the Florida drug charges against Cellilli. Cellilli immediately reported Pioggia's request to Special Agent O'Brien of the DEA, who, in turn, informed Special Agent Ritucci on February 23. Ritucci then consulted Assistant United States Attorney LaChance to determine whether Cellilli's attendance at the meeting was required. Ritucci reported that Cellilli could not avoid the meeting without endangering his informant status and his personal safety. Cellilli had said that Pioggia insisted upon his attendance at the meeting and that Pioggia had previously remarked that he would kill any associate who cooperated with law enforcement officials. In addition O'Brien had reported to Ritucci that Pioggia had a general reputation for violence and a prior conviction for possession of an explosive device.

Ritucci also reported that Pioggia wanted Cellilli's help in obtaining false documentation of legitimate sources of income. Cellilli understood that Pioggia was seeking to defeat the government's contention that drug-related money had been laundered through the construction business.

LaChance authorized Cellilli's attendance at the meeting for two reasons. The more important reason was to avoid risk to Cellilli's safety and his cover. LaChance characterized as a secondary reason his speculation that future criminal activity would take place. LaChance anticipated that immediately before the meeting with counsel Pioggia might single out Cellilli to confer about false documentation. Based on personal knowledge of the counsel involved,

however, LaChance rejected any idea that the lawyers at the meeting would knowingly participate in the creation of false documents.

Prior to the meeting, Cellilli was instructed to avoid any discussion, if possible, regarding "Barkett's criminal case" and not to reveal information to law enforcement officials from any conversations related to that issue. Discussion at the meeting focused on possible defenses to anticipated criminal charges and forfeiture proceedings. Contrary to LaChance's expectations, Pioggia did not solicit Cellilli's assistance in obtaining false documentation.

Immediately after the meeting, Cellilli met again with Special Agent Ritucci who questioned Cellilli as to whether he had anything to report within the limitations of the pre-meeting instructions. Cellilli responded ambiguously and Ritucci questioned him again. Cellilli reported that Pioggia said that he was "going to be short of legitimate funds". On a later occasion, Ritucci again questioned Cellilli about conversations concerning future criminal activity and Cellilli stated that Pioggia, outside of the presence of counsel, had commented that he might have to trace funds back to the sale of his Ludlow house to find sufficient legitimate sources of income.

After the evidentiary hearing was held on this matter, the district court found there had been no constitutional violation, basing its decision on several factors. First, the district court found that the government's informant was invited to attend the defense meeting and Cellilli's presence, therefore, was not a deliberate intrusion into the defense camp. Second, the court found that the government's rationales for authorizing attendance at the meeting, namely to maintain Cellilli's cover and insure his safety and to gather information related to future or ongoing criminal activity, were legitimate. On this basis, the district court concluded that the government's instruction to Cellilli not to reveal to law enforcement officials any information relating to Barkett's criminal case was reasonable and the subsequent debriefings were warranted. Finally, the district court found that although Cellilli overheard and conveyed confidential communications, no constitutional violation occurred because the government did not use the information it received from Cellilli.

*Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), is instructive in analyzing appellants' claim of a Sixth Amendment violation. In *Weatherford* the Supreme Court held that the intrusion by the government agent into a confidential attorney-client meeting was not a *per se* violation of the Sixth Amendment because the intrusion was not the result of a deliberate government attempt to invade the defense camp. In *Weatherford*, an informant had attended a meeting between Bursey and his attorney at the attorney's request. After conviction and service of sentence, Bursey brought a section 1983 action against state officials for violation of his Sixth Amendment rights. In that situation, the Court held, there is no constitutional violation when the government authorized attendance out of a reasonable and bona fide desire to preserve the informant's cover, *id.* at 556–58, 97 S.Ct. at 844–45, and when no confidential communications were conveyed or prejudice to the defendants shown, *id.* at 554, 97 S.Ct. at 843.

▮ As in *Weatherford*, this is not a case where the state deliberately intruded into the defense camp. Rather, one of the defendants invited the state's informant to attend the meeting. Yet this fact alone does not relieve the state of its obligation to respect the sanctity of the attorney-client relationship and the defendants' Sixth Amendment rights. Without proof of exceptional circumstances the state cannot intrude into a defense meeting. Accordingly, we believe that the government bears the burden of proving the necessity for its representative to attend meetings between defendants and their attorneys. The mere recitation of the need to protect the informant or the need to investigate future criminal activity will not suffice. The state must create a substantial record

to justify intrusion into this otherwise constitutionally protected domain.[2]

We do not believe that the record supports the state's secondary justification, namely, the need to investigate future criminal activity. LaChance's speculation, without more, that Pioggia would contact Cellilli prior to the meeting to discuss falsifying documents does not warrant an intrusion into a defense meeting. Although Cellilli testified that Pioggia previously discussed the issue of falsifying documents with him there is no evidence that Pioggia broached the subject at the time of extending the invitation. Nor is there other evidence that he suggested that he and Cellilli discuss ways in which to falsify documents prior to the meeting. Moreover, no one believed that defense counsel would participate in future criminal activity.

Thus, even if we are to assume that an investigation of further criminal activity may in some circumstance justify government intrusion into defense meetings, an assumption whose validity we need not consider today, we find there is no basis in the record for suspecting that further criminal activity would take place at this meeting. To accept the unsupported expectations of an agent that discussions of future criminal activity might take place as sufficient basis for authorizing an informant's attendance would provide too ready a key for a door that should be opened only with the most solemn deliberation.

██ We do believe, however, that preservation of an informant's cover and safety is a permissible rationale for an informant's attendance at a defense meeting. We recognize that automatically to require the government to ban an informant's solicited attendance would provide the defense with a quick and easy alarm system to detect the presence of any informants, simply by inviting all known associates of defendants to a supposed defense strategy meeting. Moreover, *Weatherford* specifically recognizes this as a permissible reason for government presence at a defense meeting. *Id.* at 557, 97 S.Ct. at 844. Although the mere incantation of the need to protect the informant is not enough to justify intrusion, we conclude that in this case there is sufficient evidence in the record to support the finding below that Cellilli's safety and cover would have been jeopardized by his failure to attend the defense strategy session. Accordingly, because the primary rationale for his presence was legitimate, authorization of Cellilli's attendance did not in itself violate the Sixth Amendment. *Id.*

Since, however, the government not only authorized Cellilli's attendance, but also subsequently debriefed him, we must consider the propriety of debriefing as well. *Weatherford* does not describe the circumstances which would warrant debriefing an informant. Indeed, the Court in *Weatherford* found no Sixth Amendment violation precisely because the informant conveyed no information to the state about the attorney-client meeting. In fact the Court noted that Bursey would have had a much stronger case:

> "[h]ad Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations ...." *Id.* at 554, 97 S.Ct. at 843.

██ In this case, however, Cellilli was debriefed on two occasions as to the information he received at the February meeting. Although the government confined its inquiry to information concerning future

**2.** The government's burden to prove the necessity for an informant's presence at a defense meeting is high. We cannot condone attendance on mere pretext. In order to avoid charges of prosecutorial abuse, we would therefore recommend that the state justify the need for the informant's attendance before a neutral magistrate. This showing would go a long way toward meeting the state's burden.

criminal activity, we have already found that the state had no basis for suspecting that ongoing criminal activity would take place at the meeting. Thus we must also conclude that the state had no justification for intruding further into the attorney-client relationship by debriefing Cellilli. Neither the preservation of his cover nor the insurance of his safety were furthered by such a procedure.

■ Our analysis does not end here. A Sixth Amendment violation cannot be established without a showing that there is a "realistic possibility of injury" to defendants or "benefit to the State" as a result of the government's intrusion into the attorney-client relationship. *Weatherford*, 429 U.S. at 558, 97 S.Ct. at 845; *United States v. Morrison*, 449 U.S. 361, 366, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981). Because in *Weatherford* no information was relayed and no tainted evidence offered, 429 U.S. at 558, 97 S.Ct. at 845, the Court had no occasion to determine what showing of prejudice is required to make out a Sixth Amendment violation. Similarly, we have not previously had the opportunity to discuss what constitutes prejudice and who bears the burden of proving it under these circumstances.

The circuit courts have thus far split on this issue. The Third Circuit and the District of Columbia Circuit have held that disclosure of defense information by itself creates a sufficient showing of prejudice. *See Briggs v. Goodwin*, 698 F.2d 486, 494–95 (D.C.Cir.1983); *United States v. Levy*, 577 F.2d 200 (3d Cir.1978). The focus in these cases is on the proof of transmission of any information of even the slightest potential strategic value. In *United States v. Levy*, 577 F.2d at 209, the Third Circuit declared that "[w]e think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case."

The Ninth Circuit, by contrast, has found that prejudice exists only when information gained through interference with the attor-

ney-client relationship is used against the defendant, *United States v. Irwin*, 612 F.2d 1182, 1186 (9th Cir.1980), and it further casts upon the defendant the burden of specifying and proving the use to which the government puts the information it has obtained. *See also United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir.1979); *Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir.), *cert. denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977). *Cf. Bishop v. Rose*, 701 F.2d 1150, 1157 (6th Cir.1983) (the court found it unnecessary to consider whether mere disclosure would have been sufficient to establish prejudice because the court found that the confidential information was used for the "benefit of the prosecution and to the detriment" of the defendant).

■ We take a middle position. Like the District of Columbia and Third Circuits, we believe that placing the entire burden on the defendant to prove both the disclosure and use of confidential information is unreasonable:

"It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions. Mere possession by the prosecution of otherwise confidential knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant. Such information is 'inherently detrimental, ... unfairly advantage[s] the prosecution, and threaten[s] to subvert the adversary system of criminal justice.' " *Briggs*, 698 F.2d at 494–95 (quoting *Weatherford*, 429 U.S. at 556, 97 S.Ct. at 844).

Like the Ninth Circuit, however, we believe that there are certain circumstances in which the revelation of confidential communications by the informant is harmless. Balancing these competing concerns, we conclude that in order to make a prima facie showing of prejudice the defendant must prove that confidential communications were conveyed as a result of the

presence of a government informant at a defense meeting. *Briggs,* 698 F.2d at 494–95; *Levy,* 577 F.2d at 209. Upon such proof, the burden shifts to the government to show that there has been and there will be no prejudice to the defendants as a result of these communications.[3]

The burden on the government is high because to require anything less would be to condone intrusions into a defendant's protected attorney-client communications. The advantage that the government gains in the first instance by insinuating itself into the midst of the defense meeting must not be abused.

The district court found that defendants established that confidential communications were passed to the government through Cellilli. The defendants claimed that as a result of these disclosures the government came into possession of their potential defense strategy against a charge of concealing drug-related money and obtained information about specific sources of funds. The district court disagreed. The court found that Cellilli's reports did not in any way tend even to suggest appellants' defense strategy to the government. Moreover, the court concluded that the government was informed prior to the meeting that defendants sought to identify legitimate sources of income to refute the claim of laundering. Finally, the court found that the government obtained information about the independent source of income prior to Cellilli's attendance at the February 24 meeting.

■ We agree with these findings. Although the district court applied what we now deem incorrect burdens of proof in its analysis, we conclude that the 12-day hearing it conducted was full and fair and untainted by the improper burdens it later applied in analyzing the evidence. On the basis of the extensive record compiled below we find the evidence presented by the government clearly demonstrated that it did not use any information impermissibly obtained from Cellilli. Indeed, it was Cellilli's allegation made *prior* to the meeting regarding Pioggia's defense to the laundering claim that the government relied upon in the first instance to authorize Cellilli's attendance. Thus, despite the government's failure adequately to justify debriefing Cellilli, we find that it successfully rebutted defendants' prima facie case of prejudice in this instance. Because no prejudice resulted to the defendant, there was no Sixth Amendment violation.

### 2. *Denial of Hearing on Wiretap Application*

Pioggia, Barkett and Mastroianni argue that the district court erred in denying them a hearing to challenge the veracity of Trooper McGreal's affidavit in support of a state wiretap application. Their argument centers on a statement in the affidavit that "[a]s of this date efforts to successfully penetrate this organization and other investigative techniques have failed."

McGreal filed the affidavit containing this statement on January 14, 1982. Five days earlier, in a meeting with DEA Agent O'Brien, Cellilli had agreed to cooperate in the government investigation.[4] Relying in

---

**3.** It could be that the District of Columbia Circuit would also adhere to this middle position. In *Briggs,* that court did not discuss the propriety of shifting the burden of proof to the government upon a showing by defendants that confidential communications were conveyed because it was unnecessary to its disposition of the case. In contrast, the Third Circuit in *Levy* expressly ruled that disclosure of attorney-client confidences conclusively established prejudice. 577 F.2d at 209.

**4.** The district court made no explicit finding on the timing of Cellilli's cooperation, concluding that "Anthony Cellilli, purportedly a top-level

member of the organization, was cooperating with the government *at least* by January 9, 1982." *United States v. Joseph C. Pioggia, et al.,* No. 82–231–K (D.Mass. May 13, 1983) (Memorandum and Order) (emphasis added). We read the record as showing that Cellilli had not agreed to cooperate before January 9, and note that the cooperation arguably began even later. O'Brien testified that he met with Cellilli for the second time on January 19 to determine whether Cellilli would cooperate enough to justify intervention on his behalf in a Florida case, which was what Cellilli had requested in exchange for his cooperation. On February 9, O'Brien and Cellilli traveled to Florida to obtain

large part on the apparent inconsistency between that fact and McGreal's statement, appellants argue that under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), an evidentiary hearing on the issue of the warrant's veracity was required. The district court disagreed, and so do we.

*Franks* requires that a defendant make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and … is necessary to the finding of probable cause" before an evidentiary hearing (a *Franks* hearing) must be held. 438 U.S. at 155–56, 98 S.Ct. at 2676.[5]

█ We cannot say that the district court clearly was in error when it concluded that Trooper McGreal's statement regarding penetration of the drug distribution network was neither knowingly false nor made with reckless disregard for the truth. *United States v. Southard*, 700 F.2d 1, 10 (1st Cir.1983) (clearly erroneous standard applies in *Franks* setting).

We do not need to consider whether McGreal's statement was actually false,[6] for even if we assume that it was, we conclude that it was not made with knowledge of its falsity or with reckless disregard for the truth. McGreal denied personal knowledge that Cellilli was cooperating with the government at the time he submitted his affidavit, and there is no compelling reason for doubting his assertion. Only five days had elapsed between the Cellilli-O'Brien meeting and the filing of the warrant application, a short period in light of the lengthy preparation necessary for the 35-page affidavit.[7] Although McGreal visited the DEA offices in Boston between January 9 and January 14, there is no indication that he met with DEA Agent O'Brien, who was stationed in Springfield,[8] or that he learned of Cellilli's decision from anyone else.[9] Although hindsight indicates

an agreement from the Broward County District Attorney's office in exchange for Cellilli's cooperation. In an affidavit, dated March 8, 1983, O'Brien stated that "[a]s a result of this trip … Cellilli agreed to provide additional information to the Drug Enforcement Administration."

Also of note is O'Brien's decision to summarize his January 9 interview with Cellilli in an "administrative page" rather than in an apparently more formal "DEA-6 Report of Interview". He testified that "[i]t was my choice at the time because I didn't know whether or not Anthony Cellilli would be cooperating with us or not. So I put it on administrative page [sic] rather than putting it into the computer." *See* transcript of hearing, June 2, 1983, at 5–107.

Defendants argue that we should not consider O'Brien's testimony because it was given after the district court denied a *Franks* hearing, and in a hearing convened for another purpose. We do not consider this information as support for our finding that Cellilli began cooperating no earlier than January 9, but only as evidence that January 9 may, in fact, be earlier than the date cooperation actually began.

**5.** Massachusetts law similarly requires a preliminary showing of a material misrepresentation made knowingly or with reckless disregard for the truth. *Commonwealth v. $992*, 383 Mass. 764, 772, 422 N.E.2d 767 (1981).

**6.** We do, however, have serious reservations about whether a magistrate would have approved the wiretap application when he did if

he had been aware of Cellilli's apparent decision to cooperate, no matter how preliminary the encounter between the government and a potential informant. Thus, while we need not decide the issue of actual falsity, we do not wish to credit the government's suggestion that an initial meeting with a potential informant does not make untruthful an assertion that "other investigative techniques have failed."

**7.** McGreal began drafting the wiretap affidavit in November 1981. *See* McGreal affidavit of February 24, 1983.

**8.** Although McGreal and O'Brien were both involved in investigating the Pioggia-Barkett network, it is relevant that they worked for two separate agencies. McGreal was a Massachusetts State Police Officer and O'Brien was an investigator for the federal Drug Enforcement Administration. Primary responsibility for the investigation was turned over to the state police in November 1981 because of DEA budgetary constraints. *See* affidavit of Gary A. Nickerson, March 7, 1983.

**9.** Defendants argue that McGreal should be charged with knowledge of Cellilli's agreement to cooperate because of a statement that he would cooperate contained in an August 1981 Florida police report. This fact hinders, rather than helps, their argument; the actual decision to cooperate came five months after the statement, and McGreal could not have been expect-

that McGreal should have made a final check with all agencies involved in the investigation before submitting his affidavit—especially since he represented the affidavit as being up to date—his failure to do so does not amount to recklessness.

Defendants argue that the reasoning of *United States v. Chesher*, 678 F.2d 1353 (9th Cir.1982), compels a finding of recklessness in this case. The court in *Chesher* reversed a denial of a *Franks* hearing on the ground that facts within the knowledge of other investigators supported a preliminary finding of the affiant's recklessness. The alleged misstatement was that Chesher was a member of the Hell's Angels. In support of his request for a *Franks* hearing, Chesher produced, *inter alia*, a state report issued four years earlier noting Chesher's expulsion from the motorcycle club. The affiant denied knowledge of the report.

Defendants claim that this case is like *Chesher*, and that McGreal's failure to discover that O'Brien met with Cellilli is at least equivalent to, and perhaps more reckless than, the California agent's failure to discover Chesher's expulsion from the Hell's Angels. Critical to the Ninth Circuit's analysis, however, was the four-year period during which Chesher's expulsion was known to those familiar with the Hell's Angels and documented in law enforcement files. In contrast, the fact that only five days elapsed between the Cellilli-O'Brien meeting and the filing of the affidavit is critical to our conclusion that McGreal, unlike the California investigator, was not reckless in failing to discover information possessed by an associated law enforcement agent.

Defendants also argue that dicta in *Commonwealth v. $992*, 383 Mass. 764, 422 N.E.2d 767 (1981), suggest that Agent O'Brien's knowledge of the Cellilli meeting itself raises an issue of veracity warranting a *Franks* hearing. The Massachusetts court stated that a hearing might be required when the affiant "or other police officer" did not "do, say, or hear what was represented in the affidavit." 383 Mass. at 775 n. 13, 422 N.E.2d 767. Unlike *Commonwealth v. $992*, this case does not involve a misrepresentation by or involving another person who is quoted or whose activities are described in the affidavit, and we decline to interpret the dicta in the Massachusetts case to extend *Franks* to this situation. *Cf. United States v. Rios*, 611 F.2d 1335, 1347–48 (10th Cir.1979) (involving misrepresentations by the affiant of another police officer's statements). Indeed, were we to adopt defendants' views, any unattributed statement in an affidavit generally describing police activities would be subject to challenge in a *Franks* hearing, a prospect we consider impractical and far beyond what is necessary to protect defendants' rights.

Although we affirm the district court's denial of a *Franks* hearing, we wish to express our concern about delayed communications between government investigators in a case such as this. It is our view that O'Brien was unwise in failing to notify McGreal earlier of his meeting with Cellilli, no matter how uncertain O'Brien might have been about the extent of Cellilli's cooperation. The state police were bearing the primary responsibility and this meeting would seem to have been a major development. Whether or not the challenged statement in the affidavit was untrue in light of this meeting, the magistrate should have been informed of the new development in the case. It may be that in other circumstances, a five-day delay in transmitting such information would be too long to avoid a finding of recklessness. Our decision is simply that, in this case, the district court did not abuse its discretion by finding that the affidavit did not contain reckless misrepresentations and, on that ground, denying defendants a *Franks* hearing.[10]

---

ed to predict when, if ever, Cellilli meant to carry through on his assertion.

**10.** Although we question whether defendants sufficiently raised the issue on appeal, we also find that the affidavit, containing the disputed statement, demonstrated sufficient probable cause to justify the wiretap.

### 3. Denial of Hearing on Delay in Bringing Indictments

Pioggia and Barkett allege that the federal government violated their due process rights by delaying the issuance of an indictment against them. They insist that they made a sufficient showing before the district court to compel a hearing on this issue and that the district court abused its discretion by not holding such a hearing.

Pioggia and Barkett point to the fact that the initial federal indictment was handed down on August 10, 1982, seven months after Cellilli began giving the government information and three months after the state grand jury handed down indictments against Barkett, Sagan and Mastroianni on what amounted to the same charges.[11] Pioggia and Barkett contend that the three affidavits that the federal government subsequently submitted to the district court gave inconsistent explanations for the delay and that the real purpose for the delay was to allow Cellilli more time to gather information about the legal defenses that defendants would employ. The government's response is that it is not required to bring an indictment as soon as it has probable cause as long as it has a good faith investigative purpose in delaying. To justify its timing in this instance, the government points to the three affidavits relied upon by the district court and argues that they provided sufficient evidence of a proper purpose, as well as a basis for denying an evidentiary hearing.

 We find the government's argument persuasive. A prosecutor is not obliged to file charges as soon as probable cause exists. *United States v. Lovasco*, 431 U.S. 783, 791, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977). "The prosecution has wide discretion in deciding to delay the securing of an indictment in order to gather additional evidence against an individual. That discretion is limited only by the requirement that it not violate those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *United States v. Ciampaglia*, 628 F.2d 632, 639 (1st Cir.1980) (quoting *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2049). Here, while the three affiants gave slightly different answers to the question of why the indictments were delayed, each of their answers makes sense both by itself and in relation to the answers given by the others. The first affiant explained that more time was needed to explore the extent of Pioggia's distribution network; the second affiant cited the same need and added that his involvement in another prosecution prevented him from giving his full attention to this case; and the third affiant, who replaced the second as lead prosecutor on this case, noted that time was needed to develop evidence in support of the continuing criminal enterprise count and, ultimately, to place Cellilli in the federal Witness Protection Program. A few days after Cellilli entered that program, the initial federal indictment was handed down against Pioggia and Barkett.

 Taken together, the three affidavits paint a consistent picture of an effort to continue the investigation into the full activity of the distribution network. This gives much credence to the denial by all three affiants that there was an intention to prejudice the defendants' case by trying to learn about their legal defenses before filing an indictment. Accordingly, we find that the district court acted well within its discretion by denying a hearing on this matter.

---

We note also that our ruling on the *Franks* issue disposes of Pioggia's and Barkett's requests that we vacate the civil contempt orders issued against them on January 6, 1984.

**11.** Pioggia and Barkett also cite the fact that on March 29, 1982, the federal government commenced a civil forfeiture action under 21 U.S.C. § 881(a)(6) to seize property that was thought to have been purchased with proceeds from their illegal drug activity. What the defendants fail to note is that the forfeiture action was commenced at such an early date solely to prevent them from selling the property and thereby putting assets subject to forfeiture out of the government's reach.

#### 4. Denial of Hearing into Possibility of Deliberate Elicitation of Incriminating Statements

Barkett also alleges that the district court abused its discretion by denying his request for an evidentiary hearing to determine whether the government violated Barkett's constitutional rights by having Cellilli deliberately elicit incriminating statements from Barkett after the state arrested and charged him on February 8, 1982, for possession with intent to distribute cocaine. The government concedes that Cellilli had a number of conversations with Barkett after he was charged and released on bail. It is also true that Cellilli attended and gave the government a five-page report about, a meeting on March 21, 1982, at which Barkett, the other three defendants, and other individuals analyzed the government's wiretap application in order to identify possible government informants. Barkett points, in particular, to Cellilli's reporting of which participants had identified which suspected informants, as well as to a March 31, 1982, reporting of Barkett's having said that he was not sleeping well for fear of going to jail and that his attorney had said that the state would not enforce the mandatory sentence in Barkett's case. Barkett claims that these facts were enough to require the district court to hold an evidentiary hearing to determine what incriminating statements were made to Cellilli after the indictment, how those statements were used by the government, and how the information they contained differed from that gathered from independent sources.

In denying Barkett's request for a hearing, the district court made several points. First, it stressed that the government had stipulated that it would not introduce at trial any incriminating statements made by any indicted defendant to either Cellilli or Barry Potter, a second informant. Second, the district court found that there was no showing of a "deliberate elicitation of incriminating statements", as is required under the Supreme Court's rulings in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); and *Massiah*

*v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Third, apparently assuming for the sake of argument that there had been such a deliberate elicitation, the district court found that Barkett's claim of tainted derivative evidence lacked the "solidity" necessary to require an evidentiary hearing. Finally, the district court added that it would hold an evidentiary hearing later and take any other necessary protective measures if it subsequently became clear that improperly obtained evidence was being introduced at trial.

■ The government argues that the district court correctly denied Barkett's request for a hearing. The government notes that it kept its promise not to introduce any post-indictment statements and argues that Barkett is still unable to point to any incriminating statements that might have led to the introduction of tainted derivative evidence. We find ourselves in significant agreement with the district court and the government.

In *Massiah*, 377 U.S. at 206–07, 84 S.Ct. at 1203–04, the Supreme Court held that any post-indictment statement deliberately elicited by a government informant could not be introduced at trial because it would have been obtained in violation of the defendant's Sixth Amendment right to counsel. In *Henry*, 447 U.S. at 274, 100 S.Ct. at 2189, the Court added that "[b]y intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel", the government violates the defendant's right to counsel.

■ It is also clear, however, that the government is not precluded from continuing an informant's contacts with a defendant simply because he has been indicted, particularly where there is an ongoing investigation to uncover other crimes or other conspirators. *Massiah*, 377 U.S. at 206–07, 84 S.Ct. at 1203–04. As Justice Powell noted in his concurring opinion in *Henry*, 447 U.S. at 277, 100 S.Ct. at 2190, the "mere presence or incidental conversation"

of the informant with the defendant is not enough.

We find on the record before us that there was nothing more than incidental conversation between Barkett and Cellilli with regard to the crime with which the former was charged. There was not that deliberate eliciting of incriminating statements that *Massiah* and *Henry* were intended to prevent. A comparison of the facts in those two cases with the facts in this case is instructive. In *Massiah*, the government installed a radio transmitter in an informant's car and then had the informant induce the defendant into discussing the crime with which he had been charged. *United States v. Massiah*, 307 F.2d 62, 66 (2d Cir.1962). In *Henry*, the government paid a jailhouse informant to overhear and report any incriminating statements the defendant made while he was imprisoned and awaiting trial. *Henry*, 447 U.S. at 270–71 n. 7, 100 S.Ct. at 2187 n. 7. The Supreme Court found particularly important the fact that the informant was to be paid only if he produced information, the fact that both the defendant and the informant were in jail together, and the fact that, in its instructions to the informant, the government singled out the defendant from other inmates. *Id.* at 270–71 & n. 7 & 8, 100 S.Ct. at 2187 & n. 7 & 8. Finally, in both *Massiah* and *Henry*, clearly incriminating statements were made to the informants and introduced into evidence at the subsequent trial.

Here the government was conducting an ongoing investigation of a number of co-conspirators, all of whom except Barkett were still unindicted. As noted earlier, Cellilli was at considerable risk and had to maintain a certain amount of contact with Barkett to protect himself and to preserve his cover. Only a few incidental statements are singled out by Barkett as having been made to Cellilli and none of them appears to be particularly incriminating on its face.[12] Furthermore, the government kept its promise not to introduce any post-indictment incriminating statements and thus protected Barkett from precisely the harm that *Massiah* and *Henry* addressed.

Accordingly, we conclude that the district court did not err in denying Barkett a *Massiah* hearing with respect to his post-indictment statements to Cellilli.[13] Nothing in the record suggests a deliberate eliciting of incriminating statements, and the district court was not required, therefore, to conduct an inquiry into the question of "taint".

### 5. *Denial of Sagan's Motion for Substitution of Counsel*

▇▇ Nor did the district court abuse its discretion in denying a motion by Sagan to substitute counsel four days before the commencement of trial. Throughout the prosecution Sagan was represented by the

---

**12.** The May 21st meeting that Barkett points to is a perfect example of Cellilli's need to continue contact with Barkett and of the incidental nature of the conversation between them. Pioggia had made threatening statements regarding informants in general and Cellilli had no choice but to attend the meeting. Barkett was only one of a number of participants. Cellilli's written report did not even mention him except to state once that he was in attendance. During Cellilli's oral debriefing he seems to have said nothing more about Barkett than that he had been one of two or three participants who had guessed at the identities of a couple of suspected informants. This is far from the kind of directly incriminating statement reported by the informant in *Henry*, for example, where the defendant described the step-by-step details of the crime. Although it is true that the meeting was subsequently listed as an overt act in the second

superseding indictment, it is only one of 18 overt acts listed for the conspiracy charge and Barkett makes no claim that any evidence of his statements was presented to the jury during the trial.

**13.** In a footnote to his brief, Barkett adds that the district court also erred by denying a *Massiah* hearing on the nature and content of informant Potter's communications with Barkett. A careful review of Barkett's supporting affidavit, however, reveals mostly statements made by Potter, not Barkett. Barkett's characterizations of his own communications are either most general in substance and timing or non-incriminating. The district court's conclusion that any claims that derivative or tainted evidence might be traced to these conversations lacked "solidity" is adequately supported.

Federal Defender's Office. From the time of his indictment until late August he was represented by Federal Public Defender Wendie Gershengorn. When she was appointed to a local judgeship, the district court allowed a continuance until September 6 to enable substitute counsel, Federal Public Defender Steven Sussman, to prepare himself for Sagan's defense. On September 2, four days before the trial was scheduled for commencement,[14] attorney Alfred Farese filed an appearance and a motion for substitution of counsel. In the colloquy that ensued during a pretrial conference, Farese was less than clear in establishing whether he would need a continuance in order to be prepared to take Sussman's place. The district court then denied the motion.

It is difficult to see how, on the basis of these facts, one could argue that the denial of the motion was an abuse of discretion. It was filed at a very late date. There was little or no assurance that Farese would be adequately prepared in time. Sagan had been represented throughout by the Federal Public Defender's Office. His right was to effective counsel, not to counsel of his own choice at any cost in terms of delay. *United States v. Poulack*, 556 F.2d 83, 86 (1st Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977). Faced with an imminent, multi-defendant trial which was certain to last a number of weeks, the court acted well within the bounds of its discretion in denying the motion.

6. *Denial of Sagan's Motion to Sever*

Sagan's second objection is equally meritless. He contends that he should have been tried separately from the other defendants because his offense was so slight in comparison to theirs and because so little testimony was devoted to the charge against him.[15] He relies exclusively upon *United States v. Donaway*, 447 F.2d 940 (9th Cir.1971), as a factually similar case in which the denial of a motion for severance was held to have deprived certain defendants of a fair trial. As the government points out, however, *Donaway* is critically distinguishable. Donaway was initially charged as a participant in a major conspiracy as well as with two minor substantive counts. During trial the conspiracy charge against him was dismissed, but only after "severely" prejudicial evidence of the conspiracy had been introduced. It was for this reason that the appellate court ruled that the district court should have severed the remaining counts against Donoway from the continuing trial of the conspiracy count against the central co-defendant. *Id.* at 943.

Here we have a very different situation. Each of the defendants was charged with the same conspiracy, and the conspiracy charge against each of them was fully prosecuted to a successful conclusion. Clearly, the risk of prejudice found in *Donaway* was nonexistent in this case. Both at the district court level and now on appeal, Sagan has failed to make the strong and substantial showing of prejudice needed to justify severance, *United States v. Ramos Algarin*, 584 F.2d 562, 568 (1st Cir.1978); *United States v. Ritch*, 583 F.2d 1179, 1181 (1st Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978). We conclude therefore that the district court did not abuse its discretion by denying Sagan's motion to sever.

In accordance with the above discussion, the district court's denial of appellants' various pretrial motions is

*Affirmed.*

---

14. The trial date had already been postponed at least twice for a total of more than three months.

15. Specifically, Sagan claims that only 94 pages of the thousands of pages of transcript are devoted to his case.