**UNITED STATES of America**

v.

**Francis J. SALEMME, et al.**

**UNITED STATES of America**

v.

**John MARTORANO.**

Cr. Nos. 94–10287, 97–10009.

United States District Court,
D. Massachusetts.

May 22, 1997.

Amended May 27, 1997.

Unsealed, Partially Unredacted, and Amended June 6, 1997.

Fully Unredacted June 28, 1997.

Fred M. Wyshak, Jr., U.S. Attorney's Office, Strike Force, Boston, MA, for U.S.

Anthony M. Cardinale, Boston, MA, for defendant Robert P. Deluca.

MaryEllen Kelleher, Law Office of Richard Egbert, Boston, MA, Anthony M. Cardinale, Boston, MA, for defendant Francis P. Salemme, Sr.

Kenneth J. Fishman, Bailey, Fishman & Leonard, Boston, MA, Richard M. Egbert, Boston, MA, for defendant Stephen J. Flemmi.

Sean E. Curran, Manchester, NH, for defendant George Kaufman.

Michael C. Bourbeau, Boston, MA, Robert A. George, Boston, MA, Paul J. Haley, Law

Office of Paul J. Haley, Hillsborough, NH, for defendant James M. Martorano.

Martin G. Weinberg, Oteri, Weinberg & Lawson, Boston, MA, Anthony M. Cardinale, Boston, MA, for defendant John V. Martorano

## ORDER UNSEALING DECISION
### June 28, 1997

WOLF, District Judge.

The previously redacted and sealed portions of the May 22, 1997 Memorandum and Order provided to the parties are now being unsealed because Angelo "Sonny" Mercurio has testified, and the government has acknowledged, that he was an informant for the government in connection with the October 29, 1989 electronic surveillance of 34 Guild Street, Medford, Massachusetts.

Accordingly, it is hereby ORDERED that the previously sealed and redacted portions of the attached May 22, 1997 Memorandum and Order (in footnotes 3 and 9) are UNSEALED.

## MEMORANDUM AND ORDER
### May 22, 1997.

### I. *Summary*

Defendants Francis P. Salemme, Stephen J. Flemmi, James M. Martorano, and Robert DeLuca have moved for hearings to determine whether particular intercepted and recorded conversations that the government proposes to introduce as evidence in this case should be suppressed because the government failed to satisfy its statutory obligations to disclose, or disclose adequately, in its applications for the relevant court orders authorizing electronic surveillance the availability of certain confidential informants and/or pertinent information provided by those informants. The defendants have submitted a series of affidavits in support of this motion. The government opposes the motion, in part because the requested hearings would require it to confirm or deny that particular individuals were secretly providing information to the government.

In addition, the defendants, except for Flemmi, have moved for an order directing the government to disclose whether James J. "Whitey" Bulger, who is charged as a codefendant but has not been arrested or appeared, was during any or all of the period relevant to this case an informant for the government. The defendants contend that in the context of this case, which charges Bulger and his codefendants with, among other things, constituting a RICO enterprise and conspiring to extort bookmakers and drug dealers, the fact, if true, that Bulger was cooperating with the government would be exculpatory information, and also be relevant to evidentiary rulings that it is foreseeable the court will be required to make at trial. Once again, the government opposes this motion based in meaningful measure on its institutional interest in maintaining the confidentiality of its sources of information.

As these motions involve allegations that specified individuals have secretly served as informants, they implicate the generally recognized interest of the government in maximizing the confidentiality of its sources in order to encourage the flow of information from informants and the interest of particular possible informants in their own safety. Thus, at the request of the parties, the court has temporarily sealed all filings concerning these motions, received *ex parte* some submissions by the government, and conducted several hearings that were closed to the public.

For the reasons described in detail in this memorandum, the court concludes that the defendants are entitled to evidentiary hearings on their motions to suppress electronic surveillance: (a) jointly conducted in 1984 and 1985, by the Drug Enforcement Administration ("DEA") and the Federal Bureau of Investigation ("FBI"), which targeted Bulger, Flemmi, and George Kaufman, among others; (b) conducted on October 29, 1989, by the FBI, at 34 Guild Street, Medford, Massachusetts; and (c) conducted on December 11, 1990, by the FBI, at the Hilton Hotel in East Boston, Massachusetts. In connection with these hearings, the defendants are entitled to discovery concerning whether Angelo "Sonny" Mercurio, Robert Donati, Bulger, Flemmi, Anthony St. Laurant, Kenneth Guarino and perhaps others were at relevant

times secretly providing information to the government. These hearings may also involve the question whether Boston Detective Sergeant Frank Dewan provided false or misleading information that was included in the applications for any of the electronic surveillance at issue.

The government has informed the court, *in camera,* that at times it elects to dismiss a case rather than confirm or deny the existence of a cooperating individual; in other instances it has, respectfully, refused to obey an order directing the disclosure of an informant, understanding that it would as a result be held in civil contempt and thus be able to, in effect, appeal that order; and, in any event, it must obtain the authorization of the Deputy Attorney General to comply with a court order requiring the identification of an informant. *See* April 16, 1997 Transcript ("Tr."), at 30–52 (*in camera* colloquy between Paul Coffey, Esq. and the court); 28 C.F.R § 16.21 *et seq.* The government requested an opportunity to consider these options if the court were to decide to grant the motions now at issue and, if appropriate, to obtain the necessary authorization to comply. The court is granting that request.

Therefore, the government is being ordered to inform the court by May 29, 1997, whether it intends to comply fully with the Order now being issued. In any event, a hearing will be held on June 3, 1997 at 10:00 a.m. to address the relevant issues, including the unsealing of this Memorandum and Order, and possibly other documents and transcripts. However, because the concerns which caused the initial sealing of the record regarding these motions continue and it is not certain whether the government will comply with the Order to disclose informants now being issued, this Memorandum and Order shall be at least temporarily sealed.

II. *Background*

The defendants are charged in the present, Fourth Superseding Indictment ("4SI") with, among other things, from 1969 to January 1995, engaging in a conspiracy to violate, and violating, the Racketeer Influenced Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961 *et seq. See* 4SI Counts 1 and 2. They

are also charged with conspiring to extort, and extorting, bookmakers and drug dealers from 1979 to June 1994. *See* 4SI, Counts 3 to 18.

With regard to the RICO charges, the alleged Enterprise is neither the Patriarca Family of La Cosa Nostra nor the Winter Hill Gang, organizations that have, in effect, been proven to be RICO enterprises in prior prosecutions. *See, e.g., United States v. Angiulo,* 897 F.2d 1169, 1175 (1st Cir.1990) (Patriarca Family); *United States v. Angiulo,* 847 F.2d 956, 960, 969–70 (1st Cir.1988) (Patriarca Family); *United States v. Winter,* 663 F.2d 1120, 1127–28 (1st Cir.1981) (Winter Hill Gang). Rather, the five defendants are alleged to have been part of a unique association-in-fact Enterprise made up of individuals who joined together to use their respective relationships with either the Patriarca Family or the Winter Hill Gang to, among other things, facilitate the unlawful activities of the Enterprise and to coordinate the activities of the Patriarca Family and the Winter Hill Gang. 4SI, ¶ 1(k); February 14, 1997 Bill of Particulars; August 23, 1995 Government's Response to Magistrate Judge Cohen's Order dated August 23, 1995, filed *ex parte* and under seal, at 4.

In several motions to dismiss the defendants have vigorously attacked the adequacy of the allegations concerning the Enterprise alleged in this case. After argument concerning the alleged deficiencies in the Third Superseding Indictment, the government obtained the Fourth Superseding Indictment, which amplified the RICO allegations.

After subsequent hearings, the court held that the Fourth Superseding Indictment adequately alleged the existence of an enterprise, but that the government would, among other things, have to prove that the alleged Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which it engaged. *See United States v. Salemme,* 1997 WL 37530, *1 (D.Mass. January 13, 1997). The court also held that, " '[t]he function of coordinating the commission of several different offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.' " *Id.* (quoting *United*

*States v. Console,* 13 F.3d 641, 651 (3rd Cir. 1993)).

The court did, however, order that the government submit a bill of particulars concerning the purported structure of the alleged Enterprise. *Id.* In response to that filing, the defendants have renewed their motion to dismiss.

If the renewed motion to dismiss is not allowed, it is evident that one element of the defense of this case at trial will be that the existence of the specific Enterprise alleged in the Fourth Superseding Indictment has not been proven beyond a reasonable doubt. It is foreseeable that proving the criminal participation of defendants Bulger and Flemmi in the alleged Enterprise will be important to establishing its existence and structure, and, therefore, important to proving the criminal culpability of all of the defendants on the RICO charges. Proving the criminal participation of Bulger and Flemmi will also be material to proving the conspiracy to extort money from bookmakers and drug dealers of which they are alleged to have been members.

The government proposes to establish the existence of the alleged Enterprise, and other elements of the various offenses charged, in part by introducing tape recordings of a substantial number of conversations which were intercepted pursuant to court orders authorizing electronic surveillance. These include: (1) Orders issued in 1984 and 1985 authorizing the DEA and the FBI to intercept telephone communications at now-deceased codefendant George Kaufman's home and conversations occurring in an automobile used by Bulger and Flemmi, in part to discern the manner in which Bulger, Flemmi, Kaufman and others participated in narcotics trafficking and illegal gambling, *see e.g.,* MBD No. 84–795, December 24, 1984 Order, Bate Stamp No. ("BS") 14556; (2) an Order issued on October 27, 1989, authorizing the FBI to conduct "roving" electronic surveillance,[1] that resulted in the interception of a Mafia induction ceremony on October 29,

1989, which was attended by Mercurio, among others, *see* M.B.D. No. 89–1015, October 27, 1989 Order; and (3) an Order issued on December 10, 1991, authorizing the FBI to conduct roving electronic surveillance to determine the manner in which Kenneth F. Guarino, Salemme, and others participated in certain crimes, *see* M.B.D. No. 91–11200, December 10, 1991 Order, BS 7200.

As set forth below, the defendants have produced substantial direct and/or circumstantial evidence indicating that during the relevant periods Bulger, Flemmi, Mercurio, and Guarino were cooperating with the FBI; that these facts, if true, were not, as required by 18 U.S.C. § 2518(1)(c), disclosed, or adequately described, to the judges who authorized particular electronic surveillances; and that, depending on the facts, each omission may have been material to the court's decision to authorize the electronic surveillance at issue. In addition, if true, the facts that Bulger and Flemmi were cooperating with the FBI during the period that they are alleged to have conspired with their codefendants and worked with them as a RICO Enterprise would be material information favorable both to them and to their codefendants in this case. Thus, the defendants are entitled to the requested evidentiary hearings on their motions to suppress electronic surveillance and to discovery regarding the status of certain individuals who defendants have shown may have been secretly providing information to the government.

III. *The Particular Electronic Surveillances*

A. *1984–1985 DEA–FBI Electronic Surveillances (M.B.D. No. 84–795)*

As indicated earlier, in 1984 and 1985 the government sought and received federal court orders and renewals authorizing the DEA and FBI to conduct jointly electronic surveillance of Kaufman's home telephone and of an automobile used by Bulger and Flemmi, among others. *See* M.B.D. No. 94–795, BS 14556 to 14879. The applications

---

1. A warrant authorizing a roving bug is an order that is issued, pursuant to 18 U.S.C. § 2518(11)(a), that does not specify the location at which the microphone is to be installed and

conversations are to be intercepted because after receiving a "full and complete statement why such specification is not practical" a judge is persuaded that representation is correct.

resulted from an investigation being conducted jointly by the DEA and FBI, and indicated that the requested electronic surveillances were intended, in part, to obtain evidence of the participation of Bulger, Flemmi, Kaufman and their associates in drug and gambling offenses. *See, e.g.,* December 24, 1984 Stephen Boeri Affidavit ("Aff."), BS 14582. Among other things, in applying for authorization to conduct electronic surveillance, the government represented that "the only reasonable likely method of gathering competent evidence of these offenses is through the requested intercept." *Id.* ¶ 101, BS 14678. The applications indicate that some information furnished by the FBI was included in the supporting affidavits submitted by a DEA agent, *id.* ¶ 75, BS 14623, and that FBI agents were assigned to work with the DEA in the investigation, *id.* ¶ 136, BS 14681. In addition, a submission made *ex parte* by the government concerning the pending motions indicates that the DEA was in 1984 providing the FBI information it was receiving regarding narcotics activity of Bulger and Flemmi. Affidavit of Paul Coffey, Esq., dated April 9, 1997, filed *ex parte,* under seal ("April 9, 1997 Coffey Aff."), ¶ 14.

■ An application for an order authorizing electronic surveillance must include:

a *full and complete statement* as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c) (emphasis added). In contrast to some other statutory provisions regarding an application, this requirement is absolute. For example, as this court has previously found:

With regard to establishing that there was probable cause for the issuance of a warrant, the government must make "a full and complete statement of the facts and circumstances *relied upon by the applicant* to justify his [or her] belief that an order should be issued." § 2518(1)(b) (emphasis added). Thus, the government has some discretion to rely upon and disclose less than all of its evidence tending to establish probable cause, *as long as there is no effort to mislead the court into approving*

*a warrant which otherwise might not have issued.*

*United States v. Ferrara,* 771 F.Supp. 1266, 1306–07 (D.Mass.1991)(emphasis added). Similarly, with regard to prior applications for electronic surveillance, the government must reveal only the facts "known to the individual authorizing and making the application." 18 U.S.C. § 2518(1)(e).

In contrast to the requirements concerning probable cause and prior applications, however, the government's statutory obligation to make "a full and complete statement" concerning the necessity of the powerful but intrusive weapon that electronic surveillance constitutes is unqualified; the government is obligated to inform the court of *all* of its information on this issue. In the context of this case, this means, among other things, that the DEA agent who filed the affidavit made part of the application for the 1984 and 1985 electronic surveillance now at issue had a duty to obtain and disclose to the court any relevant information in the possession of the FBI, which was participating in the ongoing investigation and seeking authority to conduct jointly with the DEA the electronic surveillance being requested. *See United States v. Mastroianni,* 749 F.2d 900, 909–10 (1st Cir.1984) (stating affiant "should have made a final check with all agencies involved in the investigation before submitting his affidavit").

■ Applications which are later found to be incomplete or materially misleading regarding the necessity for electronic surveillance may result in the suppression of intercepted communications. *See United States v. Simpson,* 813 F.2d 1462, 1471–72 (9th Cir. 1987) (finding, in view of affidavit's emphasis on defendant's insulation from potential informants, a deliberate effort to mislead the court concerning the deep involvement of a cooperating individual, which justified suppression). It is important that the government properly satisfy the requirement of § 2518(1)(c) because the constitutionality of Title III relies in meaningful measure on the process it provides for an independent judicial officer, rather than a law enforcement officer engaged in the competitive business of fighting crime, to decide that electronic sur-

veillance is necessary, and therefore reasonable, in a particular case. *See Steagald v. United States,* 451 U.S. 204, 212, 101 S.Ct. 1642, 1647–48, 68 L.Ed.2d 38 (1981); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); *Ferrara,* 771 F.Supp. at 1285, 1307.

A government *ex parte* submission regarding the pending motions indicates that neither Bulger nor Flemmi were referred to in any way as informants in the 1984 and 1985 applications for electronic surveillance which named them, among others, as targets. *See* April 9, 1997 Coffey Aff., ¶ 2. Thus, the court must decide if defendants should be told by the government of whether Bulger and/or Flemmi were informants during the pertinent period and, if so, whether a failure to address their status in the relevant applications requires suppression of the resulting electronic surveillance.

"The 'necessity' requirement of § 2518(1)(c) is rooted in the Fourth Amendment requirement that searches be reasonable and in the [Supreme Court's] statement in [ *Berger v. State of N.Y.,* 388 U.S. 41, 57, 87 S.Ct. 1873, 1882–83, 18 L.Ed.2d 1040 (1967) ] and [ *Katz v. United States,* 389 U.S. 347, 355, 88 S.Ct. 507, 513–14, 19 L.Ed.2d 576 (1967) ] that courts should authorize 'no greater invasion of privacy … than necessary under the circumstances.' " *Ferrara,* 771 F.Supp. at 1303 (quoting *Berger,* 388 U.S. at 57, 87 S.Ct. at 1882–83). *See also United States v. Kahn,* 415 U.S. 143, 153, n. 12, 94 S.Ct. 977, 983, n. 12, 39 L.Ed.2d 225 (1974). Accordingly, constitutional standards concerning suppression apply to alleged violations of § 2518(1)(c). *Ferrara,* 771 F.Supp. at 1298–1304; *United States v. Bianco,* 998 F.2d 1112, 1126–27 (2d Cir.1993). These include the standards established by the Supreme Court in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Ferrara,* 771 F.Supp. at 1304; *Bianco,* 998 F.2d at 1127.

■ *Franks* applies to omissions from an application or affidavit, as well as to affirmative misrepresentations. *United States v. Hadfield,* 918 F.2d 987, 993 (1st Cir.1990); *United States v. Cole,* 807 F.2d 262, 267–68 (1st Cir.1986); *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir.1990); *Ferrara,* 771 F.Supp. at 1304. Under *Franks,* when alleged omissions are involved, in order to obtain suppression, a defendant must show by a preponderance of the evidence that: (1) facts were omitted " 'with the intent to make, or in reckless disregard of whether they thereby made the [application and] affidavit misleading,' " *Colkley,* 899 F.2d at 300 (quoting *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986)); and (2) that such omitted facts were material. *Franks,* 438 U.S. at 156, 98 S.Ct. at 2676–77; *Ferrara,* 771 F.Supp. at 1305 (citing cases). " 'Material information' is information which reasonably might have prompted a district judge being asked to issue the warrant to have denied the request." *Ferrara,* 771 F.Supp. at 1305; *United States v. Ippolito,* 774 F.2d 1482, 1486–87 (9th Cir.1985) (holding that if a reasonable district judge "could have denied" the application if fully informed, the information is material.). Information is not "material" if a warrant would "necessarily, nevertheless have issued if the omitted information had been disclosed." *Cole,* 807 F.2d at 268; *see also United States v. LaRouche Campaign,* 695 F.Supp. 1290, 1305 (D.Mass.1988) (same), *aff'd* 866 F.2d 512 (1st Cir.1989); *Ferrara,* 771 F.Supp. at 1305–06 (surveying courts' formulations of the materiality standard).

■ In order to obtain an evidentiary hearing on a motion to suppress, defendants are required to make "a substantial preliminary showing." *Franks,* 438 U.S. at 170, 98 S.Ct. at 2684. More specifically:

> To mandate an evidentiary hearing the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Id.*

The court has some discretion in determining whether these standards have been met

and whether an evidentiary hearing should be held. *See Mastroianni,* 749 F.2d at 910 (finding that court did not abuse its discretion in denying defendants a *Franks* hearing); *United States v. LaRouche Campaign,* 682 F.Supp. 610, 621–22 (D.Mass.1987) (explaining considerations a court may consider in deciding whether to permit an evidentiary hearing); *Ferrara,* 771 F.Supp. at 1308–09 (finding that "government's conduct raised a sufficiently substantial question concerning its good faith to afford the court discretion as to whether [to conduct] a *Franks* hearing").

■ The court understands that it should be particularly careful in exercising its discretion when a *Franks* hearing will require the government to identify informants. Generally, the government has a right to refuse to confirm or deny the existence or identity of an informant unless a defendant offers evidence of "concrete circumstances that might justify overcoming both the public interest in encouraging the free flow of information and the informant's private interest in his own safety." *United States v. Estrella,* 567 F.2d 1151, 1153 (1st Cir.1977) (internal citation omitted).

■ As the Court of Appeals for the First Circuit has elaborated:

The seminal case regarding the duty of the government to identify or produce its informants is *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In *Roviaro,* the Court recognized "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Id.* at 59, 77 S.Ct. at 627. It specified, however, that "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61, 77 S.Ct. at 627–28. The Court declined to adopt rigid guidelines as to when the privilege should apply, opting instead for requiring the lower courts to balance, under the particular circumstances of each case, "the public interest in protecting the flow of information against the individual's right

to prepare his defense." *Id.* at 62, 77 S .Ct. at 628; *see also United States v. One 1986 Chevrolet Van,* 927 F.2d 39, 43 (1st Cir.1991); *Ass'n. for Reduction of Violence v. Hall,* 734 F.2d 63, 66 (1st Cir. 1984); *United States v. Estrella,* 567 F.2d 1151, 1152–53 (1st Cir.1977).

*United States v. Formanczyk,* 949 F.2d 526, 529 (1st Cir.1991). Application of the *Franks* standard and the *Roviaro* principles to the facts and circumstances now presented persuades the court that the defendants are entitled to the evidentiary hearings and disclosures concerning informants that they seek with regard to the 1984 and 1985 applications for electronic surveillance, targeting Bulger, Flemmi, and their alleged close criminal associates, that was to be conducted jointly by the DEA and FBI.

Defendants have provided specific reason to believe that Bulger was cooperating with the FBI during the relevant period. In addition, in the course of litigating this motion Flemmi disclosed to the court on April 16, 1997 that he was secretly furnishing information to the FBI during much of the period in which it is now charged that he was engaging in the conspiracies and other crimes alleged in the Fourth Superseding Indictment, including 1984 and 1985.

The media has often reported that during the period relevant to this case federal law enforcement sources stated that Bulger had a close relationship with Special Agent John Connolly, a member of the FBI's organized crime squad, who reportedly received information from Bulger and, in return, provided him protection from investigation and prosecution. *See* March 27, 1997 [Defendants'] Memorandum of Law, Exhibit B: Gerard O'Neill, *"The Bulger Mystique,"* Boston Globe, September 20, 1988 (ascribing information to "federal sources" and "one former official"); Dick Lehr, *Law Enforcement,* Boston Globe, October 16, 1988 (reporting that Connolly and Bulger were seen speaking on several occasions); Ralph Ranalli, *Feds Worry Leak May Be Tipping Off Whitey,* Boston Herald, December 7, 1996 ("[L]aw enforcement sources have said for years the 66–year old Bulger fed the [FBI] information on other criminals."). There is circumstantial evi-

dence that is consistent with those reports. The 1984 and 1985 electronic surveillance of Bulger was substantially fruitless, causing the DEA, reportedly, to believe that Bulger had been tipped off to it. *See* Ranalli, *supra.* In addition, Bulger has not appeared or been arrested on the charges in this case. As described, *infra,* the defendants have provided substantial evidence, including information provided by Flemmi, that Mercurio was an informant for the government and allowed to flee the charges brought against him and other alleged members of the Patriarca Family in 1990, while staying in contact with the FBI. To the extent, if any, that this is true, Bulger's flight and continued absence may be evidence of his past, if not present, association with the FBI.[2]

Significantly, Flemmi alone among the defendants did not join in the motion to compel the government to disclose whether Bulger was cooperating with the FBI during the period relevant to this case. Throughout this case the government has ardently asserted that it has substantial evidence of the extremely close association between Flemmi

and Bulger. In the course of the hearings on the present motions, in response to a question from the court, Flemmi disclosed that he had during much of the period relevant to this case been an informant for the FBI.[3] He promptly shared this information with his counsel and codefendants. While the court did not ask Flemmi if Bulger was also an informant, given the substantial evidence the government claims exists concerning their partnership, at this point this is a reasonable inference.

In any event, it is undisputed that Flemmi was cooperating with the FBI in 1984 and 1985, and this fact was not in any way disclosed or discussed in the applications for the electronic surveillance now at issue. This alone is sufficient to satisfy the first prong of the test for obtaining a *Franks* hearing.

With regard to the second prong of the *Franks* test, the arguable materiality of the facts that Flemmi and possibly Bulger were FBI informants in 1984 and 1985 is evident. The applications for electronic surveillance to be conducted by the DEA and FBI jointly

2. Neither the government nor the FBI is a monolith. It is possible that while some officials earnestly attempted to arrest Bulger after he was charged in this case, and have honestly attempted to apprehend him since that effort failed, Bulger may have been in tipped off as to their activities. Indeed, it has been reported that FBI officials are concerned that this has occurred. Ranalli, *supra.*

3. In August 1995, shortly after Flemmi was first charged, the government informed Magistrate Judge Lawrence Cohen that Flemmi had served as a confidential informant and requested authority not to disclose this fact to Flemmi's counsel, but instead to disclose certain statements previously made by Flemmi to him directly rather than through counsel. This request was made *ex parte* and under seal. It led to several *ex parte,* sealed government submissions to the Magistrate Judge. This court was not informed of these submissions or of the Magistrate Judge's rulings, which were all impounded. The court discovered them, however, in the course of the litigation concerning the motion requesting that the government be required to disclose whether Bulger was an informant. Knowledge of Flemmi's status prompted the court to seek and receive permission to question him privately, and Flemmi's decision to disclose to his attorney and codefendants his former status as an informant. April 16, 1997 Tr. at 118–122 (*in camera* colloquy between the court and Flemmi). Thus, some information

concerning Flemmi previously provided to the Magistrate Judge and to this court *ex parte* and under seal is referred to in the version of this Memorandum and Order now being provided to the parties.

The government's *ex parte,* sealed submissions to the Magistrate Judge and the court also disclose that until December 1990 Bulger too was a confidential informant for the FBI and discuss some of the implications of this fact. The court has not relied on this information in deciding whether the defendants are entitled to a *Franks* hearing with regard to the 1984 and 1985 electronic surveillance. This information, however, validates the inferences defendants have drawn concerning Bulger from circumstantial evidence and reinforces the decision that a *Franks* hearing is appropriate. As the court is not [as of May 22, 1997] certain whether the government will comply with the Order now being issued to disclose to defendants Bulger's status, the references to him in this footnote, and references to information the court has received regarding Mercurio in another case (but not relied upon to determine if a *Franks* hearing concerning the October 27, 1989 Order is appropriate) are being redacted from the version of this Memorandum and Order now being furnished to the parties [on May 22, 1997]. If the government decides to comply with the Order to disclose the status of Bulger and Mercurio as informants, the parties will be given the unredacted version of this Memorandum and Order. ·

targeted Bulger, Flemmi and their close associates, including Kaufman; informed the court that the wiretaps and bugs being sought were intended to develop evidence that Bulger, Flemmi and their close associates were engaging in illegal gambling and drug trafficking; and stated that conventional law enforcement techniques had either been utilized without success in an effort to develop similar evidence or were not likely to succeed.

However, in an *ex parte* submission to the Magistrate Judge in this case, the government stated that the Boston FBI Chief Division Counsel concluded in January 1995 "that Flemmi's FBI control agents had at least tacitly authorized his participation" in illegal gambling. Affidavit of Paul E. Coffey, Esquire, dated November 13, 1995 and filed *ex parte* and under seal, ¶ 7, n. 1, attached to November 15, 1995 Government's Response to Magistrate Judge Cohen's Order Dated August 23, 1995. The Chief Counsel did not, however, find in the file any express authorization for Flemmi to engage in crimes. *Id.*; April 9, 1997 Coffey Aff., ¶ 17. Nevertheless, knowledge that Flemmi's participation in illegal gambling had been tacitly approved by the FBI would, arguably, have caused a reasonable judge to have denied the 1984 and 1985 requests for electronic surveillance that was purportedly intended, in meaningful measure, to obtain evidence of Flemmi's gambling activity.

Moreover, if the fact that Flemmi was providing information about the criminal activity of others had been disclosed in the applications, a reasonable judge would arguably have asked for additional testimony and/or documentary evidence to determine whether Flemmi voluntarily, or if immunized and compelled to testify pursuant to 18 U.S.C. § 6001, *et seq.*, would provide some of the evidence regarding other targets that the government repeatedly represented electronic surveillance was essential to obtaining. *See* 18 U.S.C. § 2518(2) ("The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application.").

The possibility that a judge would have refused to authorize the requested electronic surveillance would have plainly been increased if Bulger was also then an informant and the judge had been so informed.

*Franks* hearings have been granted with regard to the requirement of full and complete disclosure to the court concerning the necessity of electronic surveillance when an application failed to reveal that the investigating officer was having an affair with the target's live-in companion, *Cole*, 807 F.2d at 267, and where an application misleadingly obscured the fact that a referenced informant was deeply involved with a target represented to be insulated from potential informants, *Simpson*, 813 F.2d at 1471. In the latter case, the failure to describe properly an informant who was willing to testify resulted in suppression of the intercepted conversations. *Simpson*, 813 F.2d at 1472.

■ Although it is premature to decide if suppression of the 1984 and 1985 electronic surveillance is appropriate in this case, the defendants have demonstrated that they are entitled to a *Franks* hearing on this issue. They have also established that disclosure of whether Bulger was an informant, and of all relevant, related facts concerning the relationship of Bulger and Flemmi with the FBI, is essential to a fair determination of defendants' motion to suppress electronic surveillance, which is itself important to the prosecution of this case. The defendants have also shown that the need for such disclosure outweighs the usual public interest in protecting confidentiality to encourage the free flow of information about crime to the government. *See Roviaro*, 353 U.S. at 62, 77 S.Ct. at 628–29; *Formanczyk*, 949 F.2d at 529.[4]

In addition, the conclusion that the defendants are entitled to a *Franks* hearing concerning the 1984 and 1985 electronic surveil-

---

4. Flemmi has represented to the court that he does not believe that disclosure of his relationship with the FBI will endanger his safety. April 16, 1997 Tr. at 120 (*in camera* colloquy with the court). If it is confirmed that Bulger was also secretly providing information to the FBI, this disclosure should not enhance any danger to him that might exist because defendants already believe he was an informant. If, however, Bulger feels threatened by any such disclosure, he may surrender to the United States Marshal Service and be protected pending the trial of this case.

lance conducted jointly by the DEA and FBI, including appropriate disclosure concerning Bulger's possible status as a *government informant* and explanation of Flemmi's role, is reinforced by the facts that there are other bases for ordering the same disclosure to defendants.

As described earlier, the Supreme Court has held that "where the disclosure of the informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the [government's privilege to maintain the confidentiality of its informants] must give way." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 628. This principle is a particular application of the constitutional requirement that the government disclose to a defendant all material information favorable to his defense. *See United States v. La Rouche Campaign*, 695 F.Supp. 1290, 1307 (D.Mass.1988) ("[T]he *Roviaro* obligation is not that the government turn over exculpatory evidence (an obligation already defined by *Brady*) but that the government provide a defendant with information about the identity of an informant, which may be the *means to obtain* further exculpatory evidence from that person."); *see also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) (holding that the government must turn over information that is "favorable" and "material" to the defense); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (holding that "[i]mpeachment evidence ... as well as exculpatory evidence, falls within the *Brady* rule.") (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)).

In this case, the government must prove the precise RICO conspiracy, RICO Enterprise, and conspiracy to extort bookmakers and drug dealers which are at the heart of the Fourth Superseding Indictment. *See* 4SI counts 1 and 3. Any material variance in the proof of those charges should result in the defendants' acquittal. *United States v. Glenn*, 828 F.2d 855, 858–60 (1st Cir.1987) (Breyer, J.) (dismissing drug conspiracy conviction due to variance between indictment and proof at trial); *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir.1986) ("Variances which create a substantial likelihood that a defendant may have been convicted of an offense other than charged by the grand jury ... are considered *per se* prejudicial."), *cert. denied*, 484 U.S. 815, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987); *United States v. Snider*, 720 F.2d 985, 989–90 (8th Cir.1983) (reversing convictions due to variance between number of conspiracies charged and proven), *cert. denied*, 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984).

The Fourth Superseding Indictment charges that Bulger and Flemmi were integral members of each of the conspiracies alleged; indeed, they are two of the five named coconspirators. *See* 4SI, Count 1, ¶ 2 and Count 3. They are also two of the five named members of the alleged RICO Enterprise, one purpose of which, the government contends, was to coordinate the activities of the Patriarca Family and the Winter Hill Gang. *See* 4SI Count 1, ¶¶ 1(b)(2), 1(k); February 14, 1997 Bill of Particulars.

If informed that Bulger, as well as Flemmi, was cooperating with the government during the relevant period, it is foreseeable that the other defendants are likely to argue at trial that Flemmi and Bulger were government agents; that, therefore, they were not members of the conspiracies or RICO Enterprise alleged in the indictment, *see, e.g., United States v. Duff*, 76 F.3d 122, 127 (7th Cir.1996) ("[A]n agreement with an agent of the police is not a criminal conspiracy."); *United States v. Nason*, 9 F.3d 155, 161 n. 2 (1st Cir.1993) (citing *United States v. de Bright*, 742 F.2d 1196, 1198–1200 (9th Cir.1984)); and, thus, that the conspiracies and substantive RICO offenses charged in the indictment have not been proven.[5]

---

5. The court recognizes that under *Roviaro*, the government is not necessarily required to disclose to a defendant the identity of an informant already known to the defendant. *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir.1985) ("The government's privilege does not give way simply because the defendant knows the informant's name or identity."); *United States v. Tenorio-Angel*, 756 F.2d 1505, 1510 (11th Cir.1985) (same); *United States v. Aguirre Aguirre*, 716 F.2d 293 (5th Cir.1983) (same); *United States v. Long*, 533 F.2d 505, 508 (9th Cir.1976) (same). This is

This defense may be particularly promising with regard to the RICO charges on which the government will be required to prove both the existence of the Enterprise alleged and its on-going effort to coordinate the activities of the Patriarca Family and the Winter Hill Gang, which Bulger and Flemmi are alleged to have led.[6] Similarly, if Bulger and Flemmi were informants, their codefendants are likely to contend that their statements may not be admitted under Federal Rule of Evidence 801(d)(2) because they were not truly coconspirators. *See United States v. Eisenberg*, 596 F.2d 522, 527 (2d Cir.1979) (holding that declarations of individuals acting as government informants may not be admitted on the theory that they are agents of defendants.).

Moreover, it is foreseeable that if both Bulger and Flemmi were secretly providing information to the government during the period relevant to this case, the defendants may contend that they have been entrapped or otherwise victimized by government misconduct. Indeed, this is exactly what occurred recently in several cases in the Eastern District of New York, where it was discovered that a member of La Cosa Nostra, Gregory Scarpa, who participated in some of the crimes being prosecuted, was also for many years an FBI informant.

In one case, where Scarpa's status was discovered before trial, it was reported that:

> [A]fter a six-week trial, a Federal jury in Brooklyn acquitted two reputed Columbo family capos and five soldiers on charges of conspiracy to murder and possession of firearms. Jurors said they had been influenced by the defense's central arguments: that [an FBI agent], seeking to generate evidence for arrests, had used Mr. Scarpa to foment the Columbo family war from 1991 to 1993 and that the actions of the seven defendants were taken in self-defense to escape being killed by Mr. Scarpa.

Defendant's March 27, 1997 Memorandum of Law, Exhibit A, Selwyn Raab, *The Thin Line Between Mole and Manager*, N.Y. Times, July 2, 1995, § 1, at 25.

In two other cases, Scarpa's role was not discovered until after lengthy trials. *United States v. Persico*, CR-92-0351 (E.D.N.Y. February 18, 1997); *Orena v. United States*, 956 F.Supp. 1071 (E.D.N.Y.1997). In both cases the belated disclosure generated defense motions for dismissal of the cases or new trials. After conducting post-trial hearings the presiding judges each issued 100-page opinions, one denying the motions, *see Orena*, 956 F.Supp. at 1077, the other granting three defendants a new trial, *Persico*, *supra*, slip op. at 2.

a corollary of the principle emerging from *Brady* and its progeny that the government need not disclose to a defendant exculpatory information already known to him. *See United States v. Hicks*, 848 F.2d 1, 4 (1st Cir.1988) ("[G]overnment has no *Brady* burden when facts are readily available to a diligent defender.") (citing *Lugo v. Munoz*, 682 F.2d 7, 9–10 (1st Cir.1982)); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (citations omitted), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

In this case, however, Bulger's status as an informant is suspected by defendants, but not known. Moreover, he is a fugitive and there is no evidence that defendants know where he is and can question him. These facts, combined with the potential value to the defense of a disclosure of Bulger's status, demonstrate a "real need" for disclosure. *United States v. Tucker*, 552 F.2d 202, 209 (7th Cir.1977). Disclosure of Bulger's status not only might provide the defen-

dants "the means to obtain further exculpatory evidence ...," *LaRouche Campaign*, 695 F.Supp. at 1307, but it is also consistent with the Supreme Court's exhortation that the government should "'resolve doubtful [pretrial *Brady*] questions in favor of disclosure.'" *Kyles v. Whitley*, 514 U.S. 419, 438–40, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995) (quoting *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399–2400, 49 L.Ed.2d 342 (1976)).

6. On May 27, 1997, upon further review of the November 15, 1995 Government's Response to Magistrate Judge Cohen's Order Dated August 23, 1995, the court noted that the government, at page 6, n. 2, reports that the Boston FBI Chief Division Counsel concluded in January 1995 that Flemmi's control agents had at least tacitly authorized his participation in "LCN policymaking" as well as illegal gambling. *See also*, Affidavit of Paul E. Coffey, Esquire, dated November 13, 1995, and filed *ex parte* and under seal, ¶ 7, n. 1 (same). Accordingly, this Memorandum and Order has been amended to include this information.

It would be plainly injurious to the fair and efficient administration of justice to have similar issues arise if any or all of the defendants are convicted after a lengthy trial of this case. Rather, it is now evident that issues relating to the roles of Flemmi and Bulger are inherent in this case. It is, therefore, highly desirable that those issues—and any possible, similar issues that have not yet surfaced—be addressed before trial commences.[7]

In summary, the defendants have demonstrated that they are entitled to a *Franks* hearing with regard to MBD No. 84–795, the electronic surveillance conducted jointly by the DEA and FBI in 1984 and 1985, that targeted Bulger, Flemmi and their close associates. In connection with the *Franks* hearing, defendants are entitled to disclosure of whether Bulger as well as Flemmi was, during the relevant period, a government informant, and all information regarding whether the applications for electronic surveillance included the "full and complete statement" concerning necessity required by 18 U.S.C. § 2518(1)(c). Whether Bulger was an informant is, in the context of this case, also discoverable exculpatory information.

B. *October 29, 1989 FBI Electronic Surveillance of 34 Guild Street, Medford, Massachusetts (M.B.D. No. 89–1015)*

█ As explained earlier, on October 27, 1989, the government obtained a court order authorizing roving electronic surveillance which was used to intercept a Mafia induction ceremony, on October 29, 1989, at 34 Guild Street, Medford, Massachusetts. In *Ferrara*, this court conducted lengthy *Franks* hearings and, as described below, held that the government had failed to make the legally required "full and complete statement" concerning why it was "impractical" to specify where oral communications would probably occur, *see* 18 U.S.C. § 2518(11)(a)(ii), but based on the facts then found by the court also held that suppression was not justified. *Ferrara*, 771 F.Supp. at 1306–11. The court also decided that the government was not required by 18 U.S.C. § 2518(1)(c) to disclose applications to intercept other individuals, *id.* at 1311–12, but did not address any other issues concerning whether the government had properly established the necessity for electronic surveillance.[8]

As set forth below, however, the defendants in the instant case have made a substantial showing that in October 1989 Mercurio and Donati were FBI informants, who may have learned on October 25, 1989 that the Mafia induction ceremony would occur at 34 Guild Street on October 29, 1989. If true, these facts would require reconsideration of some of the key factual findings on which the *Ferrara* decision concerning the authorization of roving surveillance was based. More significantly, these facts would present a substantial, new issue of whether suppression in this case is appropriate because the government failed to make the "full and complete statement" regarding why electronic surveillance was necessary required by § 2518(1)(c). Moreover, if Mercurio was an informant, the question would be raised whether the government engaged in misconduct because he, like Scarpa in New York, was fomenting crimes. Thus, the defendants are entitled to a *Franks* hearing with regard to the October 1989 electronic surveillance and, in connection with it, to information concerning whether Mercurio and/or Donati were then FBI informants.

More specifically, in *Ferrara*, this court found that the government failed to provide the issuing judge all of the information required with regard to whether roving electronic surveillance should be authorized, and that it initially attempted to mislead the court and the defendants concerning the existence of this issue. *Id.* at 1308 & n. 16.

---

7. The court expects, and is ordering, that if issues similar to those being decided today exist with regard to other electronic surveillance evidence that the government may wish to use in this case, the government shall inform the court of those issues immediately.

8. In *Bianco*, the district court in Connecticut adopted this court's factual findings and legal analysis, which were affirmed by the Court of Appeals for the Second Circuit. *Bianco*, 998 F.2d at 1119–20 (noting that "Judge Nevas adopted Judge Wolf's findings of fact and conclusions of law in their entirety").

After a lengthy evidentiary hearing, however, the court found the material facts to be as follows.

On Thursday, October 26, 1989, the FBI learned that a ceremony to induct new members into the Patriarca Family would take place on Sunday, October 29, 1989, at 11:00 a.m., near Wellington Circle in Medford, Massachusetts. *Id.* at 1277. On Friday, October 27, 1989, the FBI checked a furlough application of Vincent Federico, an imprisoned Patriarca Family associate suspected of being a candidate for induction. *Id.* The application stated that Federico intended to be at his sister's home at 34 Guild Street, Medford, on Sunday, October 29, 1989. *Id.* The court explicitly found, and relied upon, the fact that "[t]he FBI was not previously aware of the 34 Guild Street address as a site for the roving electronic surveillance." *Id.* The FBI, however, promptly placed 34 Guild Street under observation and, at about 12:53 p.m., observed Joseph Russo, Vincent Ferrara and Mercurio drive away from that address in a car later identified as belonging to Federico's brother-in-law Stephan DiStefano, who lived at 34 Guild Street. *Id.*

The court went on to find that, therefore, on the afternoon of Friday, October 27, 1989, the government had probable cause to believe that 34 Guild Street would soon be used as the site of a LCN induction ceremony. *Id.* at 1278. However, the government did not add this information to the draft application and affidavit it had provided to the issuing judge that morning in anticipation of receiving the required approval of the application from the Department of Justice. *Id.* Thus, the government did not make the required "full and complete statement" as to why it was "impractical" to specify the place to be bugged. *Id.* at 1278, 1307. Rather, the affidavit, incorporated in the application, incorrectly stated that " 'electronic surveillance of a specific location or telephone is not available' " *Id.* at 1279 (quoting October 27, 1989 Affidavit of Walter Steffens, Jr. ("Oct. 27, 1989 Steffens Aff."), ¶ 74(g)).

The court held, however, that despite the government's failure to make the "full and complete statement" required to permit the court to make a properly informed decision on whether to authorize roving electronic surveillance, the motion to suppress was not meritorious because neither prong of the *Franks* test had been met. First, the court found that the failure to make full disclosure was not deliberate or in reckless disregard of the truth because the relatively new roving provisions of Title III were somewhat ambiguous and, in view of the fact that the government only learned of the 34 Guild Street address on October 27, 1989, the fast pace at which it had to interpret the requirements of § 2518(11)(a) made its good faith error reasonable. *Id.* at 1280, 1309. The court specifically held that the omission with regard to § 2518(11)(a) was not motivated by the desire to protect the identity of any informant, *id.* at 1279, although this concern had animated the initially permissible decision not to mention the possible induction ceremony, or to rely on the informant(s) who told the government about it, in seeking to establish probable cause, *id.*, at 1306–07.

Second, the court found that the improperly omitted information concerning 34 Guild Street as a likely place that an order authorizing roving electronic surveillance would be employed was not material. *Id.* at 1310–11. More particularly, the court held that in view of the evidence indicating that the targets were earnestly attempting to evade electronic surveillance, any reasonable judge would have either endorsed the roving order in the form proposed by the government or amended it to make specific findings and authorize interceptions at 34 Guild Street, along with other unknown locations. *Id.* at 1310.

The facts known to the defendants and the court at the time of the *Ferrara* decision did not require the court to confront the question whether electronic surveillance was not necessary at all because of the availability of cooperating individuals.

The defendants in this case, however, have now made a substantial preliminary showing that Mercurio and Donati were cooperating with the FBI on October 1989, but that these facts were not disclosed, or adequately described, in the application for the October 27, 1989 Order. Among the facts suggesting this are the following.

After records relating to gambling and extortion were seized in a publicly known raid of Mercurio's bakery, Vanessa's, in 1988, the government made no effort to have Mercurio's parole revoked. Defendants' Offer of Proof Regarding Confidential Informants Corrected Version ("Defendants' Offer of Proof"), at 1–2. In addition, to the best of DiStefano's recollection, on Wednesday, October 25, 1989, he met Ferrara, Donati, Russo and Mercurio in the North End of Boston. April 16, 1997 Affidavit of Barry F. Collins, Jr., Esq., ("Collins Aff.") (reporting interview of DiStefano). DiStefano then drove Ferrara, Russo and Mercurio to 34 Guild Street and back to the North End, where Donati was waiting for them. *Id.* The five men discussed the proper route to 34 Guild Street, Medford. *Id.*

Mercurio attended the Mafia induction ceremony, at 34 Guild Street, on Sunday, October 29, 1989, and drove many of the participants, including DeLuca, to the event. However, when Mercurio was indicted on November 16, 1989, with Patriarca and others, he was not arrested. Rather, he was ostensibly a fugitive until apprehended and convicted for drug trafficking in Georgia in 1995.

Flemmi states, based on his personal knowledge and conversations with agents of the Boston Office of the FBI, that Mercurio began cooperating with the FBI after the raid on Vanessa's; was acting as an informant for the FBI on October 29, 1989; was given advance notice of the forthcoming charges against him and allowed to flee; and reported to his FBI handlers in Boston while a fugitive. April 27, 1997 Affidavit of Stephen J. Flemmi. Defendants also claim that Mercurio was seen with FBI Special Agent Michael Buckley. Defendants' Offer of Proof, at 4.

After Mercurio was apprehended and convicted in Georgia, the government entered into a binding plea agreement, pursuant to Fed.R.Crim.P. 11(e)(1)(c), with him. This court granted a downward departure to impose the agreed upon 110 month sentence, which in accordance with the government's plea agreement was to run concurrent with Mercurio's Georgia sentence.[9]

With regard to Donati, the defendants have presented evidence that he was a very close associate of Ferrara, often serving as his driver and attending meetings with Ferrara and his counsel. Defendants' Offer of Proof, at 5. After Donati was murdered in September 1991, it was reported that: "One source familiar with the investigation [of his death] said Donati was slain after word leaked out that he had agreed to become a government witness." David Liscio, *Revere Man Murdered for Helping FBI Probe*, Lynn Item, Oct. 1, 1989, at 1. Moreover, the government has submitted a bill of particulars listing 176 alleged members of the RICO Enterprise alleged in this case. Although well known as a close associate of Ferrara's, Donati is not included on that list. This omission suggests that he may have been cooperating with the government because an informant operating undercover is not a co-conspirator. *See Eisenberg,* 596 F.2d at 527.

The foregoing represents a substantial preliminary showing by defendants that Mercurio and Donati were FBI informants on October 27, 1989, when the government applied for the roving warrant that resulted in the interception of the Mafia induction ceremony on October 29, 1989 at 34 Guild Street. If DiStefano is correct, Mercurio and Donati would have learned the address of the ceremony on Wednesday, October 25, 1989. If true, this would draw into question the court's prior finding that the government did not learn the address until October 27, 1989,

9. Prior to Mercurio's agreement to plead guilty, on July 31, 1995, the government informed Magistrate Judge Cohen, who was handling pretrial discovery matters, that Mercurio had served as an FBI informant and requested authority to disclose certain statements previously made by Mercurio to him directly rather than through his lawyers. July 31, 1995 Government's Ex Parte Motion for Protective Order. As with Flemmi, the Magistrate Judge granted this request and impounded the motion and Order. Once again, neither the Magistrate Judge nor the government informed this court of these matters or of Mercurio's status as an informant. This court discovered the documents disclosing Mercurio's status long after it had sentenced him, when defendants, in support of the present motion, pointed out that the filing of documents under seal was reflected on the docket.

and, therefore, would require the court to reconsider its finding that the government's failure to disclose to the court the information it received regarding 34 Guild Street was a good faith, reasonable error attributable to the pace of activities on October 27, 1989, rather than a deliberate or reckless disregard of its duties under 18 U.S.C. § 2518(11)(a)(ii).[10] In addition, any information that Mercurio and/or Donati gave the government about the arrangements being made to utilize 34 Guild Street could be material to whether a fully informed judge would have authorized a roving warrant. *See Ferrara,* 771 F.Supp. at 1310–11.

Moreover, if true, the failure of the application to disclose, or adequately describe, Mercurio and/or Donati as informants is relevant to whether the government made the "full and complete statement" concerning necessity required by § 2518(1)(c) and, depending on the facts, possibly material to the question whether any electronic surveillance was reasonably required. More specifically, if a reasonable judge had been informed that the government had two informants of the quality of Mercurio and Donati, and that one of them expected to attend a Mafia induction ceremony at 34 Guild Street, at a minimum he or she would have been likely to ask if the informants were willing to wear a recording device or testify, either voluntarily or pursuant to a compulsion and immunity order. According to the media, one source said Donati "often wore a concealed body wire." Liscio, *supra.* Moreover, the affidavit in support of the application for the roving warrant did not state that the confidential sources to whom it referred would not obey a compulsion and immunity order, but only that the use of such an order would destroy those informants' future utility. October 27, 1989 Steffens Aff., ¶ 74(e). Depending on the answers to such questions, however, a fully informed, reasonable judge arguably could have refused to authorize any electronic surveillance at all. *See, e.g., Mastroianni,*

749 F.2d at 909, n. 6 (expressing Court of Appeals for the First Circuit's "serious reservations about whether a magistrate would have approved the wiretap application when he did if he had been aware of [the informant's] apparent decision to cooperate").

The foregoing alone justifies a *Franks* hearing concerning the October 27, 1989 application for authority to conduct roving electronic surveillance, notwithstanding the government's generally legitimate interest in not disclosing its sources.[11] Once again, this conclusion is reinforced by other considerations. The affidavit in support of the application treats Mercurio as a subject of the government's investigation. *See, e.g.,* October 27, 1989 Steffens Aff., ¶ 19. That affidavit reports that a reliable informant stated that Mercurio set Salemme up to be shot, "took off" after that murder attempt failed, and was opposing the "peace settlement" between Russo and Salemme being proposed by Patriarca. *Id.* If this is true the defendants here may claim that this case is analogous to those involving Scarpa in New York and should be dismissed because the government abetted Mercurio's effort to foment serious crimes. Once again, if this is to be an issue in the instant case, it is in the interests of the administration of justice that it be decided before a lengthy trial is conducted.

C. *The December 11, 1991 Electronic Surveillance at the Hilton Hotel (M.B.D. No. 91–11200)*

 The defendants have also made the showing necessary to obtain a *Franks* hearing with regard to their motion to suppress the conversations intercepted by the FBI at the Hilton Hotel on December 11, 1991. In addition, they are entitled to be told whether Kenneth Guarino and/or Anthony St. Laurant was at that time a government informant.

More specifically, on December 10, 1991, an Assistant United States Attorney applied

---

10. The court recognizes that DiStefano may be mistaken about the date and may be describing the trip this court previously found occurred on Friday, October 27, 1989. *Ferrara,* 771 F.Supp. at 1277. The *Franks* hearing being ordered should resolve this question.

11. With regard to the alleged informants' interests in their own safety, Donati is dead and Mercurio is in custody and, therefore, capable of being protected by the government.

for an order authorizing roving electronic surveillance targeting Kenneth Guarino, Natalie Richichi, and Salemme. *See* Application for M.B.D. No. 91–11200 ("Application"), BS 7206 to 7215. The Application incorporated a December 10, 1991 affidavit of FBI Special Agent Walter J. Steffens, Jr. ("Dec. 10, 1991 Steffens Aff."), BS 7220 to 7281. The proposed application was reviewed by the Criminal Division of the Department of Justice before authorization to file it was given by the Assistant Attorney General. *See* December 10, 1991 Memorandum from Assistant Attorney General, BS 7216–17.

The Application informed the judge that electronic surveillance was necessary, in part, to develop evidence that Guarino and the other named targets were committing extortion, violating the RICO statute, and conspiring to commit various other crimes. Application, BS 7207–09. It also asserted that electronic surveillance was necessary to determine the roles of Guarino, among others, in the LCN. *Id.* at BS 7209.

Guarino was described in the application as "an associate of the Patriarca Family . . . . believed to be operating pornography businesses." Dec. 10, 1991 Steffens Aff., ¶ 39(B)(2), BS 7234. The application stated that investigative techniques other than electronic surveillance were not likely to succeed in part because the suspects, including Guarino, would not be willing to be interviewed. *Id.* ¶ 73, BS 7268. In addition, it represented that no informant could provide the information concerning Salemme's role in money laundering that there was probable cause to believe the electronic surveillance of his conversations with Guarino and Richichi would provide. *Id.* ¶ 67, BS 7266.

In seeking authorization for roving surveillance, the applicant represented that the precise location of the expected meeting between Guarino, Richichi, and Salemme would take place was unknown and that all three targets conducted themselves in a manner intended to avoid the interception of their conversations. *Id.* ¶ 4(d), BS 7224. In particular, the court was told, among other things, that the Las Vegas, Nevada office of the FBI reported that Guarino and Richichi had "demonstrated a preference to meet in public places," which had frustrated a November 1991 attempt to intercept conversations in Guarino's hotel room. *Id.* ¶ 91, BS 7272–73.

As requested by the government, an order authorizing roving electronic surveillance was issued on December 10, 1991. It was utilized to intercept conversations of Salemme and Deluca on December 11, 1991. Salemme and DeLuca are now charged with aiding and abetting a violation of the Travel Act, 18 U.S.C. § 1952 and § 2, by Richichi on December 11, 1991. *See* 4SI, Count 25. Conversations intercepted at the Hilton are also likely to be offered as evidence to prove the RICO charges in the Fourth Superseding Indictment.

In the course of pretrial discovery, the defendants were provided copies of the tape recordings of the conversations intercepted at the Hilton Hotel. Listening carefully, they correctly discerned that the listening device had picked up and recorded some statements made by the monitoring agents, including FBI Special Agent Brian K. Rossi. *See* September 16, 1996 Brian K. Rossi Affidavit ("Sept. 16, 1996 Rossi Aff."). The defendants, and their experts who have analyzed the tape, assert that at one point during a conversation between Kenneth Guarino and Richichi, Rossi said:

> "Saint" . . . to make up a list of questions of shit we will make up for "Kenny" to ask him . . . we could, you know, narrow the different categories.

Defendants' Draft Transcript of Defense Enhanced Tape 4 of December 11, 1996.

Defendants contend that this comment refers to Anthony St. Laurant, a member of the Patriarca Family who is also known as the "Saint," and Kenneth Guarino. Defendants also assert that Rossi's statement indicates that Guarino and St. Laurant were government informants in December 1991, and that the application for the roving electronic surveillance improperly failed to disclose or describe them and their ability to assist the government.

Once again, defendants rely upon specific, circumstantial evidence to support their contention that St. Laurant and Guarino were

secretly cooperating with the government in 1991. With regard to St. Laurant, defendants point to favorable treatment he has received from law enforcement, including the facts that St. Laurant was recently sentenced to serve 10 months in prison on charges for which his codefendant, DeLuca, was sentenced to serve five years, and that charges against St. Laurant were dropped despite a raid which resulted in the seizure of gaming-related items and a considerable sum of money from his home. Defendants' Offer of Proof, at 6–7. In addition, defense counsel have been informed and believe that a cooperating government witness named Corley has claimed that St. Laurant was also an informant. *Id.* at 7. Moreover, they state that they have been told that St. Laurant was seen on several occasions with FBI Special Agent William Shea, whom they believe to be St. Laurant's "handler." *Id.*

With regard to Guarino, defendants represent that when he was convicted in the District of Nevada the government entered into a Fed.R.Crim.P. 11(e)(1)(c) binding plea agreement that resulted in a substantial downward departure and a 16 month sentence that only required Guarino to serve an additional five months in a "camp-type facility." *Id.* at 8. The defendants also note that Guarino arranged the time and place of the Hilton Hotel meeting, and caused his room at the Hilton to be moved shortly after his arrival, thus evidently facilitating the interception of his conversations from an adjoining room. *Id.*

The government does not completely contest the defendants' characterization of the comments by Rossi that were inadvertently intercepted and tape recorded. Rossi does, however, deny saying "Saint." Sept. 16, 1996 Rossi Aff., ¶ 1. Rather, he states that he said:

Say, make up a list of questions and shove it under the door (unintelligible) Kenny to ask. You could narrow them into (unintelligible) categories.

*Id.* ¶ 2. Rossi characterizes his comment about making a list of questions for Guarino as a "facetious" remark prompted by the thought that the conversations being intercepted could not have been better if the FBI had made a list of questions for him to ask. *Id.*

The government also has not, to date, denied that Guarino was an informant. Rather, Rossi states that he "had no knowledge at the time of this electronic surveillance whether or not Kenneth Guarino was cooperating in any capacity with the Federal Bureau of Investigation." *Id.* Similarly, Steffens represents only that he "had no knowledge at the time [he] executed the affidavit in support of the application for electronic surveillance whether or not Kenneth Guarino was either a cooperating witness or a confidential informant with the Federal Bureau of Investigation." September 16, 1996 Walter J. Steffens, Jr. Affidavit, ¶ 2. Neither Rossi nor Steffens has stated whether or not he knew in 1991 whether St. Laurant was an informant.

The foregoing constitutes the substantial preliminary showing necessary to obtain a *Franks* hearing concerning the December 10, 1991 application for an order authorizing roving electronic surveillance that was utilized to intercept conversations at the Hilton Hotel, notwithstanding the government's generally legitimate interest in protecting the confidentiality of its informants. The court has listened to the pertinent portion of the relevant tape recordings and finds that, at this point, the defendants may, or may not, be correct in their contention that Rossi said "Saint" rather than "say," and that expert testimony may, if necessary, be helpful on this issue. However, in view of the circumstantial evidence that also suggests that St. Laurant and Guarino may have been informants, defendants are entitled to know if this was indeed true and perhaps, if necessary, to test the credibility of the claim that Rossi's remark about providing a list of questions to Guarino was "facetious."

If Guarino was cooperating, the defendants appear to have a strong argument that the government did not make the "full and complete statement[s]" required by 18 U.S.C. § 2518(1)(c) and (11)(a)(ii), and that this omission was material not only to the necessity for a roving warrant, but to the reasonableness of authorizing any electronic surveillance at all. *See Mastroianni,* 749 F.2d

at 909 n. 6; *Simpson,* 813 F.2d at 1472. More specifically,· as the application emphasized the importance of obtaining evidence against Guarino, among others, it is obviously arguable that a reasonable judge could find it important that Guarino was an informant rather than a target of the investigation. The significance of St. Laurant's status as an informant is less evident at this time, but deserves to be explored if he was indeed cooperating with the government.

As defendants suggest, it is possible that representatives of the government outside of Boston, particularly FBI agents and prosecutors in Nevada, knew that Guarino was an informant, but that the applicant and affiant in Boston did not. Although this issue has not been fully briefed, there may be a strong argument that, if true, this fact would not excuse a material omission from the application and prevent suppression. The government's obligation to make the "full and complete statement[s]" required by §§ 2518(1)(c) and (11)(a)(ii) is unqualified and absolute. As described earlier, in contrast to the provision of Title III relating to prior applications, § 2518(1)(e), with regard to necessity the relevant statutory provision does not focus on the knowledge of only the individuals "authorizing and making the application." Moreover, in this case it is evident from the affidavit in support of the application that representatives of the FBI in Boston consulted their counterparts in Nevada. Dec. 10, 1996 Steffens Aff., ¶ 91, BS 7272–73. In addition, the application was reviewed, approved, and authorized by an Assistant Attorney General who presumably would have had access to all of the FBI's information concerning the status of Guarino and St. Laurant as informants.[12]

Thus, even if the affiant and applicant in Boston were not aware that Guarino was cooperating with the government, suppression of the intercepted Hilton conversations may be required. *See, e.g., United States v. Donovan,* 429 U.S. 413, 435, n. 23, 97 S.Ct. 658, 672, n. 23, 50 L.Ed.2d 652 (1977) ("There is no suggestion in this case that the Govern-ment agents failed to identify [all of those likely to be heard in incriminating conversations] for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking. If such a showing had been made we would have a different case."); *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971) ("The staff lawyers in a prosecutor's office have the burden of 'letting the left hand know what the right hand is doing' or has done"); *United States v. Harrigan,* 557 F.2d 879, 884–85 (1st Cir.1977) ("[S]uppression should be required when the statutory violation arose from a conscious decision by the federal authorities to violate the law and prevent an individual or group of individuals from receiving post interception notice" and there is prejudice resulting from the violation.); *United States v. Sullivan,* 586 F.Supp. 1314, 1319 (D.Mass.1984) (denying suppression because "[t]here is no evidence in this case that the government intentionally concealed information from the court [by choosing an ignorant applicant]. If such a showing had been made, we would have a different case"). Once again, the implications of St. Laurant's possible cooperation are not as clear.

However, for the foregoing reasons, defendants. have demonstrated that they are entitled to be told whether Guarino and/or St. Laurant were cooperating with the government in December 1991 and, if so, to have the court decide whether their status justifies suppression of the evidence relating to the December 10, 1991 Order authorizing roving electronic surveillance that was utilized to intercept conversations at the Hilton Hotel.

## IV. *Conclusion*

For the foregoing reasons, the defendants have shown that they are entitled to *Franks* hearings with regard to the 1984–85 electronic surveillance conducted jointly by the DEA and FBI, which targeted Bulger and Flemmi among others; the October 29, 1989 electron-

---

**12.** If the Assistant Attorney General did not have access to the FBI's information concerning the status of Guarino and St. Laurant, it might be necessary to determine what review, if any, of the proposed application and affidavit was conducted by FBI headquarters, which would have had access to it.

ic surveillance of 34 Guild Street that resulted in the interception of the LCN induction ceremony; and the December 11, 1991 electronic surveillance at the Hilton Hotel. The conclusion that such hearings are appropriate is strengthened, however, by several of the considerations which influenced this court to grant a *Franks* hearing on some, but not all, of the suppression issues presented in *Ferrara*. *See* 771 F.Supp. at 1308–09, 1316 (finding that defendants made a sufficient showing to obtain an evidentiary hearing on the necessity for authorization of a roving electronic surveillance, but not on the government's reasons for failing to disclose certain other applications for electronic surveillance).

More specifically, in this case, substantial questions have been raised regarding possible material omissions from the applications and the reasons for any such omissions. The court wishes to decide these important questions on a well-informed basis. *Id.* at 1308. In addition, "a thorough record would also be of assistance to a reviewing court and would likely encourage greater deference to this court's findings of fact," thus promoting efficiency and finality, which are important to the administration of justice, particularly in protracted cases. *Id.; see also Cole*, 807 F.2d at 268 ("In reviewing finding made after a *Franks* hearing, [the First Circuit uses] a clearly erroneous test.").

In addition, an evidentiary hearing is appropriate as a matter of fairness to the defendants. The electronic surveillance now at issue has been characterized by the government as important to proving the charges in this case. The court may, under the Sentencing Guidelines, be required to impose what are in effect life sentences on the defendants if they are convicted. The defendants have already proven that state law enforcement officers violated the law in conducting certain electronic surveillance the government proposes to introduce, but that those violations do not justify suppression. *See* January 29, 1997 Transcript ("Tr.") at 1–8 (finding that prosecutors violated Massachusetts law, but not federal law, in obtaining warrant from a judge in the wrong county, so evidence is admissible

in federal court); February 18, 1997 Tr. at 7–9 (finding that violation of 18 U.S.C. § 2518(8)(a) immediate sealing requirement did not warrant suppression); March 18, 1997 Tr. at 15–17 (same). Thus, in view of the substantial showings of possible misconduct and materiality they have made, it is particularly appropriate to grant the discovery and evidentiary hearings defendants are now seeking.

Also for the reasons described previously, discovery relating to the *Franks* hearings must include disclosure of whether Bulger, Mercurio, Donati, Guarino, and/or St. Laurant were government informants and, if so, whether and how they and Flemmi were described in the relevant applications for electronic surveillance. The *Franks* hearings may also involve the defendants' contention that some of the applications included information provided by Boston Police Sergeant Dewan which was falsely ascribed by him to informants. As the court has not yet discussed with the parties their recent submissions on this issue, it is premature to decide now whether the *Franks* hearings should include the Dewan matter.

As also explained earlier, if true, the fact that Bulger as well as Flemmi was a government informant is in the context of the RICO and conspiracy charges in this case information favorable to his codefendants that the government is now required to disclose. Although not discussed previously in this memorandum, a similar issue exists with regard to Salemme. In the process of providing other information for the court's *in camera* consideration, the government disclosed that in 1969 the FBI targeted Salemme for development as a potential informant and had conversations with him between April 28, 1969 and September 15, 1969. April 9, 1987 Coffey Aff., ¶¶ 18, 19. A redacted FBI report relating to one of those conversations has been provided to Salemme and his counsel. Salemme informed the court he had shared this information with his codefendants. April 18, 1997 Tr. at 11 (*in camera* colloquy between the court, counsel for the government, Salemme, and his counsel).

The information contained in the FBI report of its contact with Salemme is relevant

to the alleged Racketeering Acts concerning the murders of the Bennett brothers with which Flemmi and Salemme are charged. *See* 4SI, Racketeering Acts 21 to 23. These Racketeering Acts, which were added to the Third Superseding Indictment, are subject to a motion to dismiss for grand jury abuse that this court has indicated appears meritorious, but has not yet finally decided. The information concerning Salemme's status, however, is also arguably exculpatory with regard to the existence of the RICO Enterprise and RICO conspiracy charged in this case. Thus, the court considers it prudent to order the government to provide the redacted FBI report previously furnished to Salemme to his codefendants as well.

As indicated earlier, the court is giving the government an opportunity to consider whether it will comply with the Order now being issued and, if appropriate, to obtain the necessary authorization to disclose the identity of informants from the Attorney General or her designee.[13] Alternatively, the court understands that the government may seek to dismiss some or all of the charges in this case, or decide that it wishes to be held in civil contempt so that it may, in effect, appeal this court's Order.

Finally, to express what should be evident, the court's decision to grant defendants' motion for *Franks* hearings is not a determination that suppression of any or all of the electronic surveillance at issue is justified. Similarly, the court's decision to require the government to confirm or deny the possible status of certain individuals as informants does not constitute a determination that government misconduct has occurred. Rather, the defendants have made the substantial preliminary showings necessary to justify evidentiary hearings on these issues. Those hearings will permit the court to make properly informed decisions on their merits.

## V. *Order*

Accordingly, it is hereby ORDERED that:

1. Defendants' motion for *Franks* hearings with regard to the electronic surveil-

lance conducted jointly by the Drug Enforcement Administration and the Federal Bureau of Investigation in 1984 and 1985; conducted by the Federal Bureau of Investigation on October 29, 1989 at 34 Guild Street, Medford, Massachusetts; and conducted by the Federal Bureau of Investigation on December 11, 1991, at the Hilton Hotel in Boston, Massachusetts is ALLOWED.

2. The Attorney General of the United States or her designee shall, by May 29, 1997, inform the court and the defendants, in a submission that shall be at least temporarily sealed, whether James J. "Whitey" Bulger, Angelo "Sonny" Mercurio, Robert Donati, Kenneth Guarino, and/or Anthony St. Laurant has, at any time in the period from 1967 to the present, served as a confidential source of information (however internally designated) for any agency, agent, or attorney within the United States Department of Justice, including but not limited to the Federal Bureau of Investigation.

3. The Attorney General or her designees shall, by May 29, 1997, provide the defendants with the redacted form of the Federal Bureau of Investigation's April 28, 1969 report of its interview with Francis P. Salemme that was previously furnished to Salemme.

4. A hearing will be held on June 3, 1997, at 10:00 a.m to address discovery; scheduling; the possible unsealing of this Memorandum and Order, and other documents and transcripts; and any other issues that may be presented by the government's response to this Order.

5. If, having received this Memorandum and Order, the government recognizes that issues similar to those addressed in this decision exist with regard to other applications for electronic surveillance relating to this case, the government shall inform the court of those issues immediately.

6. This Order is, at least temporarily, SEALED, except that the government may disclose to any individual named in paragraph 2 hereinabove the contents of this Order as it pertains to him if the government

---

13. The applicable regulations, 21 C.F.R. 16.21 *et seq.*, require the Deputy Attorney General to authorize compliance. The court understands, however, that office is now vacant. Thus, the Order now being issued is being directed to the Attorney General or her designee.

deems it to be in the interest of the safety of that individual to do so.